**UNITED STATES of America, Plaintiff,**

v.

**Charles William GOFF, Sr., Charles William Goff, Jr., American Research and Development Company, Inc., and American Arms International, Inc., Defendants.**

**No. 86–CR–0168S.**

United States District Court,
D. Utah, C.D.

Dec. 31, 1987.

Bruce C. Lubeck, Asst. U.S. Atty., Salt Lake City, Utah, for plaintiff.

Max D. Wheeler, Stanley J. Preston, Larry R. Laycock, Snow, Christensen & Martineau, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION

SAM, District Judge.

This matter is before the court on the motion to suppress of defendants Charles Goff, *et al.* (the Goffs). The Goffs were indicted on twelve counts under 18 U.S.C. § 152 (bankruptcy fraud); 26 U.S.C. §§ 5861(d) and 5871 (possession of unregistered firearms); 18 U.S.C. § 2 (aiding and abetting); 26 U.S.C. § 5861(f) (unlawful manufacture of firearms); 26 U.S.C. § 5861(g) (alteration of serial numbers); and 18 U.S.C. §§ 922(m) and 924, 26 U.S.C. § 5861(*l*) (making false statements and false statements in records). Pursuant to Fed.R.Crim.P. 41(e), the Goffs move to suppress all evidence taken in this case on the grounds that each of the seven warrants used in the seizures is fatally defective and that, taken together, the searches showed a flagrant disregard for the Goffs' Fourth Amendment rights. They assert Warrant 1, an inspection warrant, and Warrant 2, a search warrant, are defective because they were issued without a proper showing of probable cause. The items seized under the subsequent warrants (Warrants 3–7) should be suppressed as "fruits of the poisonous tree," because the evidence supporting probable cause for each was uncovered during the searches conducted under Warrants 1 and 2. The Goffs also assert that even if the warrants were supported by probable cause, the searches exceeded their authorized scope.

## I. Factual Background

On October 11, 1979, American Arms International, Inc. (AAI), a wholly owned subsidiary of American Arms, Inc., became licensed as a firearms manufacturer. Charles W. Goff, Sr. (Goff Sr.) owned the company, Charles W. Goff, Jr. (Goff Jr.) acted as its president, and Goff Sr.'s wife, Gloria Goff (Mrs. Goff), as its secretary.

AAI filed a Chapter 7 bankruptcy on August 23, 1984, in which R. Kimball Mozier was appointed trustee. The Acquisition and Disposition books of AAI show that approximately 618 firearms were destroyed on February 28, 1987. On May 15, 1985, nine months after commencement of the AAI bankruptcy, the Goffs obtained a firearms manufacturer's license for American Research and Development Co. (ARDCO), another wholly owned subsidiary of Ameri-

can Arms, Inc. This time Goff Sr. was President of the company, and Goff Jr. was Vice President and Secretary/Treasurer.

In April of 1986, the Bureau of Alcohol, Tobacco and Firearms (BATF) received a letter from the National Firearms Act Branch (NFAB), the compliance branch of the BATF, stating that some machine gun manufacturers were purposefully overstating the number of machine guns they produced before May 19, 1986, the effective date of the Firearms Owner's Protection Act of 1986 (the Act). The new law contains an amendment, codified at 18 U.S.C. § 922(o ), that prohibits possession or transfer of machine guns.[1] The NFAB specifically requested BATF field offices to inspect the premises of firearms manufacturers for on-site verification of compliance with the amendment.

Agent Steven Bauer of the Salt Lake BATF visited ARDCO on May 29, 1986 to verify that 1,000 AM 180 machine guns declared to have been produced on May 15, 1986 had in fact been manufactured. An employee, Sheree Olsen, told Agent Bauer he could not enter the office or warehouse, and suggested he telephone Goff Sr. for an appointment to inspect when the Goffs would be present. Agent Bauer called ARDCO later that afternoon and twice the next morning. Each time Olsen replied that Goff Sr. was in transit and would call Agent Bauer when he arrived.

At approximately 2:00 p.m. on May 30, 1986, Goff Jr. telephoned Agent Bauer, and told him Goff Sr. was en route to Florida with 1,000 machine guns minus 40 to 50 that remained in the Salt Lake City warehouse. Goff Jr. said he would be in Florida for the next few days, but would assist Agent Bauer in an on-site inspection when he returned. After speaking to Goff Jr., Agent Bauer obtained an inspection war-

rant (Warrant 1) from a federal magistrate, and executed it the same day,[2] assisted by BATF Resident Agent in Charge, Jerry Miller, and Special Agents Swehla and Hall. The agents informed Olsen, the sole ARDCO employee on the premises, they were looking for firearms allegedly produced on May 15, 1986. They then searched the establishment in all places where firearms or firearm receivers (the component that makes the firearm fully automatic) could be stored. The agents also examined the ARDCO records and discovered a Form 2 book, the registration form for the production of firearms, which contained information that on May 16th, 1984, an additional 1,000 machine guns had been produced and registered with the BATF. No evidence of those firearms was found on the premises.

Olsen told the agents the 1,000 machine guns allegedly produced on May 16, 1986 were also being transferred by Goff Sr. to Florida. She then showed Agent Bauer an invoice, dated May 15, 1986, for 1,000 AM 180 receivers from Advanced Manufacturing Technology (AMT), a Salt Lake City company. At the conclusion of the search, Agent Bauer seized ARDCO's Form 2 Registration books and its Acquisition and Disposition of Firearms records. From the records, he calculated that ARDCO should have had approximately 700 firearms and silencers in inventory, or appropriate disposition forms and records.

On June 2, 1986, the attorney for ARDCO gave Special Agent Miller a photocopy of a May 18, 1986 letter addressed to the BATF and signed by Goff Sr., requesting the BATF to disregard the registration of machine guns produced on May 15 and 17, 1986. The next day, June 3, 1986, Dennis Barney, General Manager of AMT, confirmed to Agent Bauer that on May 16, 1986, ARDCO contracted with AMT to pro-

---

**1.** 18 U.S.C. § 922(o ) reads:
(o )(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun [sic].
(2) This subsection does not apply with respect to—
(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof; or

(B) any lawful transfer or lawful possession of a machinegun [sic] that was lawfully possessed before the date this subsection takes effect.

**2.** Agent Bauer captioned his warrant application as "Application for Inspection and Examination under the Gun Control Act of 1968."

duce 1,000 M–2 Model C machine gun receivers for $30,000. Barney said AMT received payment in full for the contract, and was told to produce the receivers as soon as possible because an imminent change in the Federal Firearms laws would affect their production.

Agent Bauer then met with Inspector Marin of the BATF who informed Agent Bauer that while conducting a routine compliance inspection of ARDCO on April 25, 1986, she showed Goff Jr. a copy of the proposed amendments to the firearms statute that would prohibit possession and transfer of machine guns manufactured after the effective date. At that time, Inspector Marin heard two telephone conversations in which Goff Jr. said the Goffs had "four weeks at the outside" before the new law would take effect. Exhibit "B."

On the basis of the information obtained from the records, letter and interviews, Agent Bauer obtained and executed a search warrant (Warrant 2) on June 5, 1986. Four subsequent searches of ARD-CO, under Warrants 3–7, resulted in the seizure of various records and inventory.

The Goffs now move to suppress all evidence taken in this case as having been seized under invalid search warrants.

## II. The validity and scope of Warrant No. 1

The Government asserts that under the Gun Control Act of 1968, 18 U.S.C. § 923(g)[3], no warrant was required for the initial search; therefore, the search cannot be invalidated on the ground that the warrant was not obtained upon a showing of probable cause. As supporting authority, the Government cites *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), in which the United States Supreme Court held that under the Gun Control Act, no warrant is required for regulatory inspections of federally licensed firearms dealers because "the statutory authority is the equivalent of a valid search warrant." *United States v. Cooper*, 409 F.Supp. 364, 368 (M.D.Fla.), *aff'd*, 542 F.2d 1171 (5th Cir.1976). The Goffs counter that *Biswell* says if the inspector's entry should be denied, as it was here; he cannot forcibly enter, but rather, must bring the appropriate civil or criminal action against the party, or obtain a valid search warrant upon a showing of probable cause. In this court's opinion, the Goffs misread *Biswell* and its progeny.

### A. *The Biswell–Colonnade exception*

The *Biswell* Court addressed the constitutionality of the Act's provisions that allow warrantless searches of the premises of federal licensed firearms dealers. There, a city policeman and a Federal Treasury agent inspected the records of the defendant (a pawn shop operator who was federally licensed to deal in firearms), then requested entry into a locked gun storeroom. The defendant asked whether the agent had a search warrant, and the agent replied no warrant was necessary

**3.** Section 923(g), 18 U.S.C. provides:

Each licensed importer, licensed manufacturer, licensed dealer, and licensed collector shall maintain such records of importation, production, shipment, receipt, sale, or other disposition, of firearms and ammunition at such place, for such period, and in such form as the Secretary [of the Treasury] may by regulations prescribe. Such importers, manufacturers, dealers, and collectors shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, dealer, or collector for the purpose of inspecting or examining (1) any records or documents required to be kept by such importer, manufacturer, dealer, or collector under the provisions of this chapter or regulations issued under this chapter, and (2) any firearms or ammunition kept or stored by such importer, manufacturer, dealer, or collector at such premises. Upon the request of any State or any political subdivision thereof, the Secretary may make available to such State or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State or political subdivision, who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition.

because section 923(g) authorizes warrantless inspections. After reading a copy of the section, the defendant permitted the investigators to enter the storeroom where they found two sawed-off rifles the defendant was not licensed to possess. The defendant was indicted and convicted on charges arising from his unlawful possession of the rifles. The Court of Appeals reversed, holding that section 923(g) is unconstitutional under the Fourth Amendment because it authorizes warrantless searches of business premises, and the defendant's "ostensible" consent was invalid. *Biswell,* 406 U.S. at 313, 92 S.Ct. at 1595, 32 L.Ed.2d at 91. The Supreme Court reversed the judgment of the Court of Appeals.

The Court began its analysis by referring to *Colonnade Catering Corp. v. United States,* a case dealing with the statutory authorization for warrantless inspection of federally licensed dealers in alcoholic beverages. 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed. 2d 60 (1968). Upon the *Colonnade* defendant's refusal to allow inspectors to enter his premises without a warrant, the inspectors forcibly entered a locked storeroom and seized illegal liquor. Upholding the validity of the warrantless regulatory search, the Court reasoned:

> When the officers asked to inspect [the defendant's] locked storeroom, they were merely asserting their statutory right, and [the defendant] was on notice as to the identity and the legal basis for their action. [The defendant's] submission to *lawful* authority and his decision to step aside and permit the inspection rather than face a criminal prosecution is analogous to a householder's acquiescence in a search pursuant to a warrant when the alternative is a possible criminal prosecution for refusing entry or a forcible entry. In neither case does the lawfulness of the search depend on consent; in both, there is lawful authority independent of the will of the householder who might, other things being equal, prefer no search at all.... In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the

search depends not on consent but on the authority of a valid statute.

*Biswell,* 406 U.S. at 313, 92 S.Ct. at 1596, 32 L.Ed.2d at 91–92 (emphasis in original) (footnote omitted). In subsequent related cases, various courts denominated this rule the *"Colonnade–Biswell* exception" to the Fourth Amendment prohibition of warrantless searches. *See, e.g., Joe Flynn Rare Coins Inc., v. Stephan,* 526 F.Supp. 1275, 1285 (D.Kan.1981) (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 314, 98 S.Ct. 1816, 1821, 56 L.Ed. 305, 312 (1978)). The Supreme Court in *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), succinctly stated the rule of those cases:

> These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

*Id.,* 452 U.S. at 600, 101 S.Ct. at 2539, 69 L.Ed.2d at 270. Thus the Court recognized Congress' powers to design inspection laws that sanction warrantless inspection searches of closely regulated enterprises; however, it also noted that "Congress had not expressly provided for forcible entry in the absence of a warrant and had instead given Government agents a remedy by making it a criminal offense to refuse admission to the inspectors under [the controlling statute]." *Biswell,* 406 U.S. at 313, 92 S.Ct. at 1595, 32 L.Ed.2d at 91. The Court distinguished *Biswell* from *Colonnade* by concluding the *Biswell* search was not accompanied by unauthorized force.

The Goffs assert *Biswell* requires that, after being denied entry to a business premises while making a warrantless regulatory inspection, the government agent must then obtain a search warrant based upon probable cause that meets the standard applicable in a criminal matter: the agent must show he has reasonable cause

to believe that a violation of the Act occurred and that evidence of that violation may be found on the target business premises. This court finds nothing in *Biswell* to indicate the placement of so stringent a burden on a government agent attempting to conduct a regulatory inspection search. Rather, *Biswell* merely prohibits use of *unauthorized force*, that is, forcible entry in the absence of a warrant; it does not set out guidelines or standards related to that warrant. For instruction on the procedure an agent should follow upon being denied entry, the court looks to *Camara v. Mun. Court of the City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

*Camara* concerns the annual building inspection of a residence whose owner, the defendant, refused the inspector entry because the inspector did not have a search warrant.[4] The inspector returned two days later, again without a warrant, and the defendant refused to allow an inspection. A citation was issued to the defendant, and after he failed to appear as ordered, the inspectors returned to his residence. They read the defendant the section of the Housing Code related to their right to enter the premises; however, he again refused entry. The defendant was later arrested and convicted of refusing to permit a lawful inspection. On appeal, the defendant argued he may not be prosecuted for refusing to permit an inspection because the section allowing the inspection violates the Fourth and Fifth Amendments by authorizing municipal officials to enter a private dwelling without a search warrant and without prob-

able cause to believe that a violation of the Housing Code exists. The Court of Appeals upheld the conviction, stating that the section authorizing warrantless inspections did not violate Fourth Amendment rights because it was part of a regulatory scheme that is essentially civil rather than criminal in nature, and the right of inspection is limited in scope and may not be exercised under unreasonable conditions. The Supreme Court reversed, noting the Court's concern over allowing invasion of the privacy of the home, and holding that "except in certain carefully defined classes, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Id.*, 387 U.S. at 528–29, 87 S.Ct. at 1731, 18 L.Ed. 2d at 935 (citations omitted). *Camara* preceded by five years the 1972 *Biswell* decision; however, in 1978, the *Marshall* Court referred to the liquor industry (*Colonnade* ) and the firearms industry (*Biswell* ), as industries within the "certain carefully defined classes of cases referenced in *Camara.*"[5] *Marshall*, 436 U.S. at 315, 98 S.Ct. at 1821, 56 L.Ed.2d at 312.

Upon concluding that the section authorizing the warrantless inspection was constitutionally infirm, the *Camara* Court stated that conclusion was the beginning rather than the end of its inquiry. It then considered the probable cause standard by which the decision to conduct an administrative search must be tested. Similarly, this court's analysis of the validity of Warrant No. 1 begins rather than ends with the determination that upon being denied entry to inspect ARDCO, Agent Bauer was re-

---

**4.** *Biswell* compared *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), a case involving regulatory inspections to discover and correct violations of the building code, to the inspection of a federally licensed firearms dealer. The Court stated that both inspections require "unannounced, even frequent, inspections." *Biswell*, 406 U.S. at 316, 92 S.Ct. at 1596, 32 L.Ed.2d at 92.

**5.** *Marshall* is instructive on the court's rationale for carving out the *Colonnade–Biswell* exception to the rule that warrantless searches are unreasonable under the Fourth Amendment.

Certain industries have such a history of government oversight that no reasonable expectation of privacy ... could exist for a pro-

prietor over the stock of such an enterprise. Liquor (*Colonnade* ) and firearms (*Biswell* ) are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation.

... The element that distinguishes these enterprises from ordinary business is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware.... The businessman in a regulated industry in effect consents to the restrictions placed upon him. *Marshall*, 436 U.S. at 313, 98 S.Ct. at 1821, 56 L.Ed.2d at 312 (citations omitted).

quired to obtain an inspection warrant to gain entry to the storage area. Here, as in *Camara*, the next question is the proper probable cause standard to be applied to these facts.

### B. The Camara standard for probable cause

■ The *Camara* Court disagreed with the defendant's assertion that warrants related to code enforcement inspection programs "should issue only when the inspector possess probable cause to believe that a particular dwelling contains violation of the minimum standards prescribed by the code being enforced." *Camara*, 387 U.S. at 534, 87 S.Ct. at 1734, 18 L.Ed.2d at 938. In reaching its determination that a health official need not "show the same kind of proof to a magistrate to obtain a warrant as one must who would search for the fruits or instrumentalities of crime," (*id.*, 387 U.S. at 538, 87 S.Ct. at 1735, 18 L.Ed.2d at 940), the Court reasoned:

> Unlike the search pursuant to a criminal investigation, the inspection programs at issue here are aimed at securing city-wide compliance with minimum physical standards for private property....
>
> . . . . .
>
> ... [T]he agency's decision to conduct an area inspection is unavoidably based on its appraisal of conditions in the area as a whole, not on its knowledge of conditions in a particular building. [The Municipality] contends that, if the probable cause standard urged by [the defendant] is adopted, the area inspection will be eliminated as a means of seeking compliance with code standards and the reasonable goals of code enforcement will be dealt a crushing blow.

*Id.*, 387 U.S. at 535–36, 87 S.Ct. at 1734–35, 18 L.Ed.2d at 939. *Camara* discussed the necessity of allowing a municipality to conduct routine periodic inspections of all structures, then stated its holding concerning the applicable standard for probable cause.

> Having concluded that the area inspection is a 'reasonable' search of private property within the meaning of the Fourth Amendment, *it is obvious the 'probable cause' to issue a warrant must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling.* Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time ... or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling.... The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. *If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant....* Such an approach neither endangers time-honored doctrines applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area.

*Id.*, 387 U.S. at 538–39, 87 S.Ct. at 1735–36, 18 L.Ed.2d at 941 (emphasis added). Finally, the Court noted:

> [A]s a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry. Similarly, the requirement of a warrant procedure does not suggest any change in what seems to be the prevailing local policy, in most situations, of authorizing entry, but not entry by force, to inspect.

*Id.*, 387 U.S. at 539–40, 87 S.Ct. at 1736, 18 L.Ed.2d at 941–42.

The court's review of the instant facts in light of the above principles convinces it that Agent Bauer acted properly by obtaining an inspection warrant after being denied entry to ARDCO and that the showing of probable cause was sufficient to validate the search conducted under the warrant.

Agent Bauer initiated the inspection of ARDCO while acting under the NFAB's mandate to inspect firearms manufacturers to determine compliance with the amendment prohibiting the possession of machine guns manufactured after a certain date, which inspection the court considers analogous to the area inspection in *Camara. At that juncture, the inspection was not an investigation directed specifically at the Goffs or ARDCO; Agent Bauer had no reason to believe the Goffs had not complied with the amendment.* After being denied entry by Olsen, Agent Bauer made three more telephone calls to ARDCO, then followed the *Biswell* instruction by obtaining an inspection warrant. The Goffs argue he acted improperly because Goff Jr. informed Agent Bauer that all but 50 to 60 machine guns were in transit to Florida and that Goff Jr. would assist Agent Bauer in a search when Goff Jr. returned, five days later; therefore, Agent Bauer had no reason to believe he would find on ARDCO's premises evidence of a violation.

The court agrees Agent Bauer could not show probable cause to believe that Goffs had misrepresented the number of machine guns manufactured before the Act took effect or that evidence of the activity could be found on the ARDCO premises. However, it is clear that Agent Bauer was still acting under his original NAFB mandate to conduct a regulatory inspection when he returned to ARDCO, and he had authority to inspect ARDCO's records and firearms irrespective of any statement or action by the Goffs. Notwithstanding the suspicions Goff, Jr.'s call might have raised in Agent Bauer's mind, *Agent Bauer was still acting under the statutory authority granted by the Act when he executed Warrant 1.* Consequently, the *Camara* standard for probable cause must be applied in the court's analysis of whether the affidavit presented to the Magistrate contained information sufficient to support issuance of a valid inspection warrant. The court determines the *Camara* standard was met as

there was probable cause to issue a "suitably restricted" search warrant because "a valid public interest justified the intrusion contemplated," and "reasonable legislative or administrative standards for conducting an area [or, in this case, general] inspection" were satisfied with respect to the search of the ARDCO warehouse. The *Biswell* Court discussed the valid public interest in conducting unannounced inspections of federal firearms dealers.

[C]lose scrutiny of [the federal firearms] traffic is undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders. *See* Congressional Findings and Declaration, Note preceding 18 U.S.C. § 922. Large interests are at stake, and inspection is a crucial part of the regulatory scheme, since it assures that weapons were distributed through regular channels and in a traceable manner and makes possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms.

It is also apparent that if the law is to be enforced and inspection made effective, inspections without warrant must be deemed reasonable official conduct under the Fourth Amendment.... [I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible.

. . . . .

We have little difficulty in concluding that where, as [in the inspection of firearms dealers], regulatory inspections further urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive dimensions,[6] the

---

**6.** *Biswell* analyzed the reasonableness of a warrantless search by weighing the governmental interest against the firearms dealer's right to privacy.

It is ... plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a deal chooses to engage in

inspection may proceed without a warrant where specifically authorized by statute.

*Biswell,* 406 U.S. at 317, 92 S.Ct. at 1597, 32 L.Ed.2d at 93 (footnote added).

This court considers the public interest underlying the NFAB mandate even more compelling than the interest at stake in *Biswell.* A review of the legislative history of 18 U.S.C. § 922(*o* ) reveals that H.R. 3155, the precursor of the bill enacted as the Firearms Owners' Protection Act of 1986, set out the urgent governmental interests underlying the amendment as being, in part, to "[prohibit] the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," and to "[prohibit] the transfer and possession of silencers, used in assassinations and contract murders...." H.Rep. No. 3155, 99th Cong., 2d Sess. 4, *reprinted in* 1986 U.S.Code Cong. & Admin.News 1327, 1330. Certainly, BATF inspections for compliance with the prohibition are within the class of federal interests discussed in *Biswell* and *Camara.*

Further, the court's review of Agent Bauer's affidavit accompanying his Application for Inspection and Examination under the Gun Control Act of 1968 convinces it the *Camara* standard for probable cause was met regarding the suitability of the restrictions upon the search. After a recitation of the facts surrounding the denied entry, Agent Bauer set out the statutory and decisional authority supporting issuance of the inspection warrant.[7] He also indicated that the search was "carefully limited in time, place and scope" (*Biswell,* 406 U.S. at 315, 92 S.Ct. at 1596, 32 L.Ed.2d at 92) and that "reasonable legislative or administrative standards for conducting a [general] inspection" would be satisfied with respect to ARDCO's warehouse (*Camara,* 387 U.S. at 538, 7 S.Ct. at 1735, 18 L.Ed.2d at 941) by attesting the inspection would be conducted during daytime hours; the special agent's credentials would be displayed; the inspection examination would begin as soon as practicable after the issuance of the warrant and be completed with reasonable promptness; and the inspection and examination would be

this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection. Each licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority. 18 U.S.C. § 921(a)(19). The dealer is not left to wonder about the purposes of the inspector or the limits of his task.
*Biswell,* 406 U.S. at 316, 92 S.Ct. at 1596, 18 L.Ed.2d at 92–93.

7. The affidavit states, in relevant part:

7. Such licensee [Goff, Sr.] is required to maintain records of the shipment, receipt, sale or other disposition of firearms at such place, in such form and for such period as the Secretary of the Treasury prescribes by regulations. 18 U.S.C. § 923(g) and 27 C.F.R. § 178.121, *et seq.*

8. Such licensee must make such records available for inspection at all reasonable times by the Secretary of the Treasury or his delegate. 18 U.S.C. § 923(g).

9. Duly authorized special agents may enter such licensee's premises (including places of storage) during business hours for the purpose of inspecting or examining (1) any records or documents required to be kept by such licensee

under the provisions of Chapter 44, Title 18, United States Code or the regulations issued under that Chapter, and (2) any firearms or ammunition kept or stored by such licensee at such premises. 18 U.S.C. § 923(g) and 27 C.F.R. § 178.23. This authority was upheld in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

10. This is a statutorily authorized inspection and examination designed to assure compliance with the Gun Control Act of 1968.

. . . . .

13. Any firearm or records involved in any violation of Chapter 44, Title 18, United States Code or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the united States may be seized pursuant to 18 U.S.C. § 924(d), and *United States v. Petrucci,* 486 F.2d 329 (9th Cir.1973) [, *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287].

. . . . .

15. The authority for the issuance of the inspection and examination warrant is 18 U.S.C. 923(g); *cf. Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60, 1970; *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)....

limited to the records and firearms stored on the premises. The court concludes that where the search was an area inspection in nature and the Goffs were not under criminal investigation, the Magistrate acted properly by issuing Warrant 1 upon Agent Bauer's showing the statutory standards for the inspection warrant were met.

■■■ The Goffs point out that under the recent amendment to § 923 found at 18 U.S.C. § 923(g)(1)(A), Congress permits issuance of a search warrant only upon a showing before a magistrate of reasonable cause to believe the premises contains evidence of a crime. The Court first notes that § 923(g)(1)(A) became effective on November 1, 1987, more than one year after the subject search took place. The propriety of Agent Bauer's actions must be judged in light of the statutory authority and interpretative case law in place at the time of the search. Even if it were controlling, section (g)(1)(A) requires neither probable cause nor a warrant for a regulatory inspection search. The section reads, in relevant part:

> The Secretary, *when he has reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises,* may upon demonstrating such cause before a Federal magistrate and securing from such magistrate a warrant authorizing entry, enter during business hours the premises (including places of storage) of any licensed ... manufacturer, ... for the purpose of inspecting or examining—
>
> (i) any records or documents required to be kept by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector under this chapter or rules or regulations under this chapter, and
>
> (ii) any firearms or ammunition kept or stored by such ... licensed manufacturer ... at such premises.

(Emphasis added). The clear import of the language is that the criminal standard for determining probable cause applies only when the inspector has reason to believe a violation has occurred. Indeed, section 923(g)(1)(B)(ii) specifically states that the Secretary may inspect the inventory and records of a licensed firearms manufacturer *without reasonable cause or warrant* "for ensuring compliance with the record keeping requirements of this chapter not more than once during any twelve-month period...." Consequently, the Goffs' argument related to the trend of the law is not helpful to their position. Clearly, Congress did not intend to abandon completely the deterrent effects of warrantless, unannounced inspection searches.

Nor are the Goffs helped by the case law they brought to the court's attention after the hearing on their motion to suppress. In *United States v. Limatoc,* 807 F.2d 792 (9th Cir.1987), two BATF agents entered the defendant's premises to execute a search warrant for an 9mm machine pistol which they had reason to believe had been converted, without requisite registration, to an automatic-firing, machine-gun-style weapon. By 3:00 p.m., the agents concluded their search without finding the pistol. They then requested to inspect the defendant's records, during which inspection, the agents discovered an AR–15 rifle that had been modified to fire fully automatic. The defendant was indicted on two counts related to possession of the AR–15 as converted. The Eighth Circuit affirmed the district court's grant of the defendant's motion to suppress on the ground that the agents had discharged their obligations under the initial search warrant by 3:00 p.m., and the administrative search they conducted was improper because it did not occur during "business hours" as required by statute. The search was conducted before 4:00 p.m., the hour at which the defendant normally commenced business operations. *Limatoc* is inapposite to this case for two reasons: 1) the *Limatoc* agents obtained the warrant and conducted the search pursuant to a reasonable belief the defendant had committed a crime; and 2) the search violated statutory guidelines because it was not conducted during business hours.

Where neither scenario arises in this case, the *Limatoc* holding is not relevant to the present issues.

■ The Goffs assert that even if valid, Warrant 1 only allowed Agent Bauer to inspect and examine ARDCO's firearms and records and that his seizure of ARDCO's Form 2 Registration books and its Acquisition and Disposition books was not authorized by the Act.

The question of an agent's authority to remove records from the premises of a party under section 923(g) inspection is addressed in *Cooper*, a case with facts nearly identical to the instant facts. 409 F.Supp. 364 (Inspectors conducting a routine regulatory search removed records from the office of the defendant for further examination of discovered improprieties). This court considers the *Cooper* holding dispositive of the question of the propriety of the removal of records from the ARDCO premises.

> The Secretary's special agent ... properly removed the logbook for two reasons. First, lawful statutory authority to search, like valid consent 'carries with it the right to examine and photocopy' the records inspected. *United States v. Ponder*, 444 F.2d 816, 818 (5th Cir.1971) [, *cert. denied*, 405 U.S. 918, 92 S.Ct. 944, 30 L.Ed.2d 788 (1972)]. In *United States v. Business Builders, Inc.*, [354 F.Supp. 141 (D.C.Okla.1973)], the trial court denied the defendants' motion to suppress evidence of contaminated food that violated federal statutes, because the statutes granted Food and Drug inspectors the right to search the defendants' premises. Since the statute authorized [the special agent] to inspect the logbook, he also rightfully removed it in order to copy or otherwise preserve the evidentiary information contained in it. *United States v. Ponder*, [444 F.2d at 818]. *See United States v. Miller*, 491 F.2d 638, 650-51 (5th Cir.) [, *cert. denied*, 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186 (1974)]. Second, the lawful statutory authority to search also confers the right to seize evidence of criminal activity during the course of the search. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Warden, Md. v. Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

*Cooper*, 409 F. Supp. at 368; *United States v. Trevino*, 679 F.Supp. 633 (S.D.Tex.1986) (Special agents inspecting without a warrant may remove examined records from the business premises); *see United States v. Cerri*, 753 F.2d 61, 64 (7th Cir.), *cert. denied*, 427 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985); *Petrucci*, 486 F.2d at 332 ("Having intruded legitimately, upon discovery of several unrecorded firearms, the agents were free to seize the weapons without a warrant as evidence or instrumentalities of illegal activity now in their 'plain view' as a result of a lawful search."). For these reasons, there is no merit to the Goffs' contention that while BATF agents may enter his place of business and inspect the required firearms records, the agents may not remove these records from the premises.

Accordingly, the court concludes the search conducted pursuant to Warrant 1 was valid, and the removal of ARDCO's Form 2 Registration books and its Acquisition and Disposition books was proper.

### III. The validity and scope of Warrant No. 2

■ The Goffs first argue that probable cause for Warrant 2 was based upon "tainted information" obtained under Warrant 1. Because the court has ruled on the validity of Warrant 1, it will not consider further the merits of that argument. Second, they contend that the mere absence of some 700 firearms (which Goff, Jr. explained were in transit to Florida) coupled with Goff, Jr.'s statements regarding the time remaining before the new bill would take effect were insufficient to provide probable cause for Warrant 2.

#### A. Probable cause

In making their argument that Warrant 2 was not supported by probable cause, the

Goffs ignore the portion of Agent Bauer's affidavit accompanying his application for Warrant 2 that relates to May 18, 1986 letter, signed by Goff, Sr., in which ARDCO cancelled the registration of machine guns purportedly produced on May 15 and 17, 1986. The logical inference from the letter is that the Goffs were representing the machine guns had not been produced. Further, the Goffs ignore Barney's statement that AMT received from ARDCO an order for 1,000 M–2 Model C machine gun receivers, with instructions to complete the order as soon as possible. AMT received ARDCO's order on May 16, 1986, three days before 18 U.S.C. 922(*o*) became effective and two days before the date of the letter cancelling the BATF registrations. The court considers this information sufficient to meet the criminal standard for probable cause in support of Warrant 2. Agent Bauer had reason to believe that a Federal Firearms law had been violated and that evidence of the violation (not necessarily confined to the presence or absence of the machine guns allegedly manufactured) could be found on ARDCO's premises. Moreover, the above facts supporting probable cause were presented to the issuing magistrate, and "[a] magistrate's reasonable conclusion that probable cause exists is ... conclusive absent arbitrariness." *United States v. Strauss*, 678 F.2d 886, 892 (11 Cir.1982); *United States v. Long*, 674 F.2d 848, 852 (11 Cir.1982); *United States v. Weinrich*, 586 F.2d 481, 487 (5th Cir.1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979). The court finds no evidence of arbitrariness in the issuance of Warrant 2.

## B. *Particularity of the warrant description*

 The Goffs next contend that the search conducted under Warrant 2 exceeded its authorized scope because the items to be searched and seized were not set out with sufficient particularity, and the agents were free to rummage through ARDCO records and inventory. Warrant 2 authorized a search for:

> 700 firearms, firearms transaction records including, but not limited to ATF Forms 2; Notice of Firearms Manufactured or Imported; ATF Forms 3, Application for Tax Exempt Transfer; ATF Forms 4, Application for Tax Paid Transfer; ATF Forms 5, Application for Tax Exempt Transfer; ATF Forms 4473, Firearms Transaction Records; and commercial documents including, but not limited to, purchase and sales invoices for firearms, parts, and materials thereof, and financial records; which are evidence of the fruits and instrumentalities of a violation of Title 18, U.S.C. § 922(m).[8]

Exhibit "B." The Goffs specifically object to the generality of the language "commercial documents including, but not limited to ..." and "financial records." Concerning the commercial documents and financial records, the court finds nothing troubling in the return on the Warrant 2.[9]

---

**8.** Section 922(m), 18 U.S.C. provides:

> (m) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

**9.** The return on Warrant 2 listed the following items seized:

> (1) an aluminum case containing a machine gun with a silencer;
> (2) a black silencer;
> (3) a silver silencer;
> (4) firearms journals of American Arms International NFA weapons;
> (5) firearms ammunition records, semi-automatic rifles, miscellaneous handguns/rifles record;
> (6) black firearms acquisition and disposition book for American Int. Corp.;
> (7) an American 180M–2 .22 caliber machine gun;
> (8) a Samsonite brown briefcase with an American Arms Int. model M2 with a laser light;
> (9) a box containing American Arms Research and Development Co., American Arms Int., Inc. and American Arms Int. records;
> (10) check vouchers and deposits, C.O.D. invoices from January through March, 1986;
> (11) Federal express receipts filed and accounts payable;

The Fourth Amendment permits searches and seizures only when supported by a warrant that "particularly describ[es] ... the things to be seized." U.S. Const. amend. IV. "The purpose of the Fourth Amendment is to forbid a general warrant" (*Stanford v. Texas*, 379 U.S. 476, 480, 509, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965)), and to prevent the "seizure of one thing under a warrant describing another" (*Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed.2d 231, 237 (1927)). "[T]he particularity requirement is a rule of reason," (*United States v. Scherer*, 523 F.2d 371 (7th Cir.1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1108, 47 L.Ed.2d 315 (1976)). Warrant terms are sufficiently particular "when [they enable] the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wolfenbarger*, 696 F.2d 750, 752 (10th Cir. 1982).

In *United States v. Lamport*, 787 F.2d 474 (10th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986), the Tenth Circuit rejected the defendant's argument that the warrant was too general by concluding that the term "financial records" is "a sufficiently specific description of the things to be seized under *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 [1976], and *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231," because the term was followed by the words "and any other property that constitutes evidence of the commission of the criminal offense Title 18, United States Code, Section 1341 [Mail Fraud]." *Lamport*, 787 F.2d at 476. Here, the terms "commercial documents" and "financial records" were limited by the subsequent language "which are evidence of the fruits and instrumentalities of a violation of Title 18, U.S.C., Section 922(m)." The court considers that limiting language sufficiently specific to prohibit the "general, exploratory rummaging in a person's belongings" proscribed by *Andresen*. Indeed, the *Andresen* Court upheld the validity of a warrant that contained, following a list of particular items, the language: "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." The Court concluded the language was sufficiently specific because, read in the context of the entire warrant, it confined the search to evidence of the crime charged. In this case, the government asserts the financial records sought and obtained related solely to the 700 firearms at issue. The Goffs make no specific allegations to the contrary. Where the items seized did not include personal or private articles, items unrelated to proving a violation of section 922(m) or First Amendment material, the court finds no abuse of warrant regarding these documents. *Cf. Marcus v. Search Warrant of Property at 104 E. 10th St., Kan. Cty., Mo.*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); *Stanford*, 379 U.S. at 478, 485, 85 S.Ct. at 508, 511, 13 L.Ed.2d 431 (1965).

The court is not moved from its conclusion by the Goffs' assertion that *United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982), prohibits searches for all evidence of a certain violation. The *Cardwell* warrant authorized seizure of various specific items, and concluded with the language: "which are the fruits and instrumentalities, of violations of 26 U.S.C. § 7201 [tax evasion]." That court held the warrant lacked sufficient particularity because "upon the information available to it [after a lengthy IRS civil audit], the government knew exactly what it needed and wanted and where the records were located. There was no necessity for a massive re-examination of all records bearing on income and expenses." *Id.* at 78 (quoting *VonderAhe v. Howland*, 508 F.2d 364, 369 (9th Cir.1974)). *Cardwell* interpreted *VonderAhe* and *An-*

---

(12) ARDCO weekly sales reports from February 5, 1986 through May 23, 1986;
(13) Customer orders journal;
(14) a sales graph;
(15) American Arms Corp. statement;

(16) Form 2 Registration book dated November 1979 through 1981; and
(17) two books filled with invoices dating from November of 1983 to May of 1986.

*dresen* as "requiring courts to consider the totality of circumstances in determining the validity of a warrant." *Cardwell,* 680 F.2d at 78. The court then noted that one of the crucial factors is the information available to the government. "Generic classifications in a warrant are acceptable only when a more precise description is not possible." *Id.* (quoting *United States v. Bright,* 630 F.2d 804, 812 (5th Cir.1980)); *see also, United States v. Cook,* 657 F.2d 730, 733 (5th Cir.1980); *VonderAhe,* 508 F.2d at 370. Here, there is no showing the BATF had comprehensive knowledge of ARDCO's inner workings that would have enabled it to describe the precise documents sought or where they were located. Consequently, the court considers the Tenth Circuit's recent opinion in *Lamport,* as discussed above, controlling on the question of the required specificity. *Lamport* found the "generic" language "and any other property that constitutes evidence of the commission of the criminal offense [mail fraud]...." sufficiently specific even where the information that comprised probable cause was provided by two secretaries of the defendant, both of whom had access to the subject files. *Lamport,* 787 F.2d at 474, 475. The Tenth Circuit reasoned:

> The defendant urges particularly that in view of the variety of circumstances under which mail fraud may be charged the last phrase is too general. The phrase, in our view, refers to the specific items listed and thus is not something different. The official who made the investigation was a postal inspector who was familiar with the scheme and who provided the affidavit, was the person to whom the warrant was directed, and the one who conducted the search (with others and in the presence of the defendant) and who executed the return. The return listed only items specifically described [including "financial records"]. Thus this case is unlike *Voss v. Bergsgaard,*

774 F.2d 402 (10th Cir. [1985]), where the Government failed to pinpoint the statutes violated or to establish that the alleged crime permeated the business. The circumstances are very much like those in *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 [1984].... We do not consider the warrant to be invalid but if it were the evidence would not be suppressed under *Massachusetts v. Sheppard,* or under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 [1984].[10]

*Id.* at 476 (footnote added). Thus it was not improper for Agent Bauer, who was trained in inspections, to look through ARDCO documents in an effort to find those subject to seizure. *See, e.g., United States v. Heldt,* 668 F.2d 1238, 1267 (D.C. Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982) (Documents may be perused briefly to determine whether probable cause exists for their seizure under the warrant. If their incriminating character should become obvious, the documents may be seized; otherwise, the perusal must cease at which the warrant's inapplicability to each document is clear).

Accordingly, the court concludes the warrant terms meet the reasonableness test as they are sufficiently specific to prevent a general search. *See Strauss,* 678 F.2d at 892 (Upholding a warrant containing the term "and other stolen property" and omitting specific identification of vehicles sought. "[The defendant] seeks to hold the issuing court to too strict a standard. A search warrant must indeed be sufficiently precise as not to permit a general search, but the test is reasonableness of the description. Elaborate specificity is unnecessary."); *United States v. Osborne,* 630 F.2d 374, 378 (5th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981) (Finding sufficiently precise a description of items sought as "money order

---

**10.** The *Lamport* court's reference to *Sheppard* and *Leon* concerns the rule stated in those cases that the exclusionary rule will not be applied when the officers conducting the search act in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate, and the warrant is later determined to be invalid.

machine" and "any other evidence" relating to a robbery); *United States v. Freeman*, 532 F.2d 1098 (7th Cir.1976).

Also seized pursuant to the warrant were two machine guns (one with a silencer) and two silencers. The Goffs contend that seizure was improper because the warrant term "700 firearms" is insufficiently particular under the Fourth Amendment. They cite *Bright*, 630 F.2d 804, as support for their position that where Agent Bauer had access to the serial numbers of the machine guns that were allegedly produced, the warrant was constitutionally deficient because the numbers were not included in the warrant terms. In *Bright*, the court denied the defendant's motion to suppress two bills seized during a search of the defendant's home under a warrant that did not list the serial numbers of the bills sought. The factual distinction between *Bright* and the instant case is that the bills seized in *Bright* were on a list of payoff money prepared under the direction of the FBI, and the money was passed by an informant. Therefore, the reliability or completeness of the list was not a question in *Bright* as it is here where the serial numbers were provided by the Goffs, and the truthfulness of the records is at issue. Furthermore, *Bright* held that when the police possess a conclusive list of serial numbers, those numbers must be stated in the warrant; however, when law enforcement officers are in possession of some but not all the serial numbers of the currency subject to seizure, the warrant is not insuf-

ficiently particular because it does not list the serial numbers the officers knew were subject to seizure.[11] *Id.* at 812; *United States v. Davis*, 542 F.2d 743 (8th Cir.), cert. denied, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976); *Hanger v. United States*, 398 F.2d 91 (8th Cir.1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969). After concluding the warrant should have included the serial numbers if the money on the prepared list had been the sole object of the search, *Bright* continued:

> The question thus becomes whether it would have been consistent with the purpose of this search to have seized currency other than that which appeared on [the] list. We find that it would have been. Because the police believed Hamilton was accepting kickbacks from many people besides [the informant], we cannot say their search for currency should have been limited to that which they knew came from [the informant]. Therefore, we hold the search warrant in this case was sufficiently particular to satisfy the Fourth Amendment.

*Bright*, 630 F.2d at 812. In the present case, the BATF agents had no guarantee the lists of serial numbers in Goffs' records were conclusive or accurate,[12] and where the statute cited in the warrant, 18 U.S.C. § 922(m), concerns falsification of firearms records, "it would have been consistent with the purpose of the search" (*id.*) to have seized firearms other than those that appeared on the Goffs' list.

**11.** The discussion in *Bright* is instructive on the particularity requirement as it relates to serial numbers.

> If the police have only a partial list of relevant serial numbers, listing those numbers in a search warrant as a non-conclusive list of currency subject to seizure gives the party searched no more protection against a general search than is present if the warrant permits simply 'seizure of currency.' If, however, the police have a conclusive list of serial numbers so that other currency is not relevant to their inquiry and not properly subject to seizure, the listing of those numbers does give the party searched added protection. It is settled law that generic descriptions in a warrant are acceptable only when a more precise descrip-

tion is not possible. *See James v. United States*, 416 F.2d 467, 473 (5th Cir.1969), cert. denied, 397 U.S. 907, 928, 90 S.Ct. 902, 903, 938, 25 L.Ed.2d 87, 108 (1970). Accordingly, to the extent the police can only legitimately seize currency of known serial numbers, those serial numbers must be listed in the warrant.

*Bright*, 630 F.2d at 812.

**12.** At the motion to suppress hearing, Agent Bauer testified he did not list serial numbers for the firearms because there were too many unanswered questions to make any conclusive determination regarding serial numbers.

Mention of the seizure of firearms not included on the Goffs' list leads the court to the final point the Goffs raise in support of their contention that the BATF agents exceeded the scope of their search authorized under Warrant 2. They claim the BATF agents improperly seized some silencers, one of which was attached to a machine gun, because the silencers were not specifically listed in the warrant terms, and as per *Arizona v. Hicks,* — U.S. —, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), they were not subject to seizure under the plain view doctrine. The court first notes that 18 U.S.C. § 921 includes in its definition of "firearm": "(C) any firearm muffler or firearm silencer; . . . ." Consequently, the court's conclusions related to probable cause and particularity apply to the silencers, because the silencers could be included in the description of "700 firearms," and falsification of records concerning them would be a violation of § 922(m). The *Hicks* decision does not alter the court's opinion on the admissibility of the silencers. In *Hicks,* officers entered an apartment on a warrantless search (justified by exigent circumstances), seeking a gun involved in a shooting. While lawfully on the premises, one officer noticed two sets of expensive stereo components that appeared out of place in the otherwise shabby living room. He lifted and turned over some of the components to copy their serial numbers, then called in the numbers and discovered the components were stolen. A warrant was obtained, and the equipment was seized. The defendant was subsequently indicted for robbery. The Supreme Court affirmed the decisions of both lower courts to suppress the evidence seized, on the ground that when the officer moved the component to obtain its serial number, he commenced an additional search unrelated to the search for which he was lawfully on the premises. The Court rejected the State's contention that the evidence was properly seized under the plain view doctrine, and held that because the officer was required to move the component to read the serial numbers, he intruded on con-

cealed portions of the apartment and its contents. The intrusion constituted a separate search for which independent probable cause was required.

In the present case, the court is not faced with the *Hicks* question because, unlike the stereo equipment involved in the search for a pistol, the silencers seized by the BATF agents are items related to the lawful objective of the BATF agents' entry to ARDCO. That is, they are firearms covered by § 922(m), and were subject to seizure under Warrant 2.

The court concludes that neither Warrant 2 nor the search conducted pursuant to it violated the Goff's Fourth Amendment rights.

## IV. The scope of Warrants 3–7

Having determined that Warrants 1 and 2 were adequately supported by probable cause and that the searches did not exceed their authorized scope, the court need not reach the Goffs' argument that evidence seized under Warrants 3–7 should be suppressed as "fruits of a poisonous tree," because probable cause for each warrant arose from evidence taken under the assertedly defective Warrants 1 and 2. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Even so, the court determines that each affidavit accompanying Warrants 3–7 contains sufficient information to support a finding of probable cause for the search and seizure of the items described in the warrant. With that note, the court turns its attention to the Goffs' remaining contention that the searches conducted under Warrants 3–7 exceeded their authorized scope.

### A. *Warrant 3*

Warrant 3 authorized a search on the ARDCO premises for a number of receivers identified by their serial numbers and "firearms transactions documents relating to May 18, 1986, letter to the [BATF]." The return on the warrant shows that in addition to the receivers, the

agents seized: "3 Diablo typewriter ribbon cartridges, 4 photographs of [a] Quad gun on aircraft and 2 computer floppy discs from 8050 disc drive (Commodore model)." The Goffs assert the agents exceeded the scope of their warrant by seizing the ribbon cartridges, photographs and floppy discs. Because the Government does not intend to introduce into evidence the ribbon cartridges and photographs, the court will confine its discussion to the propriety of the seizure of the floppy discs.

Paragraph 11 of the affidavit accompanying Warrant 3 contains, in relevant part, the following information:

> Olsen was told by Charles Goff, Jr. that a letter was in the file to the [BATF] cancelling the production of 2,000 receivers. Olsen knew that no such letter was in the file as of May 30, 1986. On June 2, 1986, Olsen found a copy of a letter to [the BATF] cancelling the 2,000 Am 180 M-2 receivers in ARDCO files. The letter was not prepared by her but appeared to be typed on the Commodore 8032 computer at ARDCO. A copy of that letter should be found on the computer's floppy disc and/or ribbon.

Clearly, the BATF agents were entitled to conduct a *Heldt* perusal of the contents of the floppy discs in an effort to find the letter, just as they were entitled to peruse documents to determine their incriminating value. The difference here is that the incriminating or probative value of the floppy discs is not the presence, but rather, the absence in the discs' contents of the letter allegedly written on May 18, 1986. Therefore, although the court would be inclined to exclude any evidence obtained from the floppy disc or as a result of evidence obtained from the disc that is not related to the May 18, 1986 letter, the court considers the disc itself admissible for the limited purpose of showing the presence or absence of the purported letter.

B. *Warrant 4*

[redacted] Warrant 4 authorized the search of ARDCO's subcontractor, ATM, in order to seize approximately 1,000 ARDCO, American 180 Machine receivers; their blueprints and invoices; contracts between AMT and ARDCO, including any shipping records and proof of payment on contracted work; any and all ARDCO AM 180, M-2 machine gun receivers that may be in various stages of production, including any parts and materials; which violate 18 U.S.C. § 922(m).

The Goffs allege that the BATF agents seized 833 aluminum blocks alleged to be American 180 receivers and 356 aluminum receiver blocks alleged to be receivers in various stages of production. They contend the warrant only permitted seizure of receivers far enough advanced in the manufacturing process that they would qualify to be called "firearms." The Goffs make much of the fact that although, on cross-examination at hearing, Agent Bauer could not state with precision at what point in the manufacturing process an aluminum block becomes a receiver; during the search, he was left, in his inexpert manner, to judge whether the aluminum boxes were yet receivers. The court considers Agent Bauer's lack of precise knowledge on this question irrelevant to the issues here. The warrant authorizes seizure of "any and all ARDCO AM 180, M-2 machine gun receivers *that may be in various stages of production, including any parts and materials* ... which violate 18 U.S.C. § 922(m)" (emphasis added.) At hearing, Agent Bauer stated his knowledge that the production of a receiver starts with a block of aluminum of the same size and shape as those seized, and testified that he recognizes each stage in the development of a receiver. There is no dispute that he possessed sufficient expertise to execute the warrant within appropriate limitations by seizing only receivers in production and the materials from which they are made. That is precisely what he did. The discussion of when an aluminum block becomes a receiver is largely academic because the warrant did not confine the search to receivers only. Moreover, the very nature of the asserted violation, the falsification of records relat-

ed to firearms allegedly completed by May 19, 1986, justifies the seizure of firearms in any stage of production after that date.

### C. *Warrant 5*

■ Warrant 5 authorized BATF agents to search the Goffs' GMC "Jimmy" vehicle for the purpose of seizing a "metal stamp tool used for applying serial numbers to firearms." The Goffs assert the agents unconstitutionally exceeded the scope of Warrant 5 by continuing their search of the vehicle for 30–40 minutes after they seized the tool stamp from a spot near the tailgate. No other item was seized.

Unquestionably, any item seized after the agents had attained their lawful objective of the search would be subject to suppression (*see Limatoc*, 807 F.2d 792); however, nothing was seized, and the fact that the agents continued the search after finding the object described in the warrant does not mandate suppression of the highly probative tool stamp that was legally seized (*see Heldt*, 668 F.2d at 1259).

### D. *Warrant 6*

Warrant 6 authorized a search of an ARDCO subcontractor, EMP, for the purpose of seizing "AM180 M–2 receivers, serial numbers 1001 through 2001 and contracts or other records relating to the manufacture of such receivers." The return shows the BATF agents seized IBM tape readouts for tapes A–30 and D–28 programs; operator sheets; inspection reports; tooling and material purchase orders; blueprints; specification changes; miscellaneous correspondence; internal product reports; a trigger housing; a top slide; 1066 miscellaneous gauging; 3 com-

pleted receivers and 6 partially completed receivers.

■ For reasons cited in its discussion of the particularity of Warrant 1, the court finds no problem related to the seizure of the documents pursuant to the language, "contracts or other records relating to the manufacture of such receivers." The receivers sought are listed by serial number, and taken as a whole, the warrant terms limit the document search to those related to the production of the listed receivers. *Andresen*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627.

■ The Goffs raise again the issue of the propriety of the seizure of aluminum blocks that are not yet receivers. Although the issue is less clear-cut under Warrant 6 than under Warrant 4, because Warrant 6 contains no language related to materials or receivers in various stages of development, the court remains persuaded by the logic of the situation that the BATF agents were authorized to seize, in any stage of their production, receivers that allegedly had been ordered by the Goffs for production after May 19, 1986. Indeed, the legislative history of the Act shows that the definition of "machine gun" was amended to include "any part designed and intended to be used for converting any weapon into a machine gun." [13] H.Rep. No. 945, 99th Cong., 2d Sess. 28, *reprinted in* 1986 U.S.Code Cong. & Admin.News pp. 1327, 1354. The stated purpose for the inclusion is to "help control the sale of incomplete machine gun conversion kits that now circumvent the prohibition on selling completed kits." *Id.* Further, 18 U.S.C. § 921(a)(24) defines "firearm silencer" and "firearm muffler" as

any device for silencing, muffling, or diminishing the report of a portable fire-

**13.** 18 U.S.C. § 921(a)(23) provides: "The term 'machinegun' has the meaning given such term is section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))." Section 5845(b) defines "machinegun" as

any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the

trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or a combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

arm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

While the Goffs might question whether an aluminum bloc is a "part" as contemplated in these subsections, the clear congressional intent permeating the statute is that the prohibition on the possession of machine guns, including receivers, extends to materials intended for use in their production. Here, there is no question that the aluminum blocks seized were intended for use in the assembly or fabrication of receivers.

### E. *Warrant 7*

▮ Warrant 7 authorized the search of ARDCO for the purpose of seizing 15 receivers, identified by serial number. The Goffs again allege that partially completed receivers were improperly seized under the warrant. That issue has been treated in the court's discussion of Warrants 4 and 6, and the court's conclusions are fully applicable to facts surrounding the execution of Warrant 7.

Also seized were two items not listed in the warrant: product literature and an engraver tip. The government does not intend to introduce the items into evidence, and the court need not consider them further.

### V. Total suppression of the evidence

▮ Finally, the Goffs argue that all evidence taken in this case should be suppressed because the various searches and seizures showed such a flagrant disregard for the terms of the warrants that total

suppression is necessary. As support for this position, the Goffs quote the *Terry v. Ohio*, 392 U.S. 1, 17–18, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), language: "[A] search which is allegedly reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." The also rely on dicta in *Heldt:*

> When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms, and the warrant limitation becomes a practical nullity. Obedience to the particularity requirement both in drafting and executing a search warrant is therefore essential to protect against the centuries-old fear of general searches and seizures.

*Heldt,* 668 F.2d at 1257. The *Heldt* court expressly rejected the defendant's argument that all the evidence taken in the searches conducted should have been suppressed because the search *as a whole* was a general search.[14] This court considers pertinent to this case, the *Heldt* Court's rationale for affirming the denial of the defendant's motion to suppress all evidence taken:

> We recognize that in some cases a flagrant disregard for the limitations in a warrant might transform an otherwise valid search into a general one, thereby requiring the entire fruits of the search to be suppressed. *See generally United States v. Rettig,* 589 F.2d 418, 423 (9th Cir.1978); [ (officers obtained a warrant by tricking the defendant and deceiving the issuing court) ]; *United States v. Fernandez,* 430 F.Supp. 794, 801 (N.D.

---

14. The law is settled that absent a "flagrant disregard" for the warrant's limitations, "unlawful seizure of items outside a warrant does not mandate the drastic remedy of suppression of all evidence." *See Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *United States v. Lambert,* 771 F.2d 83 (6th Cir.1985), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985); *Marvin v. United States,* 732 F.2d 669 (8th Cir.1984). Courts that have con-

sidered this issue have almost unanimously declined to suppress all evidence under a "flagrant disregard" theory. *See Lambert,* 771 F.2d 83; *Marvin,* 732 F.2d 669; *United States v. Whitten,* 706 F.2d 1000 (9th Cir.1983), *cert. denied,* 465 U.S. 1110, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *United States v. Wuagneux,* 683 F.2d 1343 (11th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

Cal.1976); *United States v. Nine 200–Barrel Tanks of Beer,* 6 F.2d 401, 402 (D.R.I.1925). *Cf. United States v. Tracy,* 350 F.2d 658 (3d Cir.), *cert. denied,* 382 U.S. 943, 86 S.Ct. 390, 15 L.Ed.2d 353 (1965) (all evidence suppressed for disregard of limits on use of force). If in this case law enforcement officers had conducted a document search as if no limiting warrant existed, rummaging at will among defendants' offices and files, then the mere existence of a valid—but practically irrelevant—warrant for certain specified documents would not be determinative of whether the search was so unreasonable as to require suppression of everything seized. *Defendants do show several instances where documents were seized outside the warrant, but they do not demonstrate such flagrant disregard for the terms of the warrant which might make the drastic remedy of total suppression necessary.* Absent that sort of flagrant disregard, the appropriate rule seems to be that where officers seize some items outside the scope of a valid warrant, this by itself will not affect the admissibility of other contemporaneously seized items which do fall within the warrant....

*Heldt,* 668 F.2d at 1259 (emphasis added) (citations omitted).

In fact, if defendants wish to object to the introduction into evidence of the items particularly described and, therefore, legitimately seized, the burden is upon *defendants* to show that seizure of the described items or other misconduct in the search rendered the entire search unreasonable.

*Fernandez,* 430 F.Supp. at 801 (emphasis in original); *United States v. Leta,* 332 F.Supp. 1357 (M.D.Pa.1971). The Goffs fail that heavy burden, because although there exists some evidence that items not described in the warrants were seized, the court considers none of the deviations from the warrants terms seriously prejudicial to the Goffs and or demonstrative of "such flagrant disregard" for the warrant terms

that "the drastic remedy of total suppression" is required. This is particularly true in light of the court's conclusion that all evidence taken may be admitted with the limitation placed on the information contained on the floppy disc obtained under Warrant 3.

It appears to the court that the bulk of the Goffs complaints related to the agents' alleged "flagrant disregard of constitutional limitations" actually concern the BATF agents' conduct that was unrelated to the searches themselves. For example, the Goffs claim the agents "tried the case to the media" by publicly disparaging the Goffs. While this, and other such claims, might become relevant to issues raised at trial, they are irrelevant to the motion at hand.

VI. Conclusion

The Goffs' Motion to Suppress Evidence is denied in total with the limitation placed on information derived from the floppy disc obtained under Warrant 3.