UNITED STATES of America, Plaintiff,

v.

Creed Miles EVANS, John William Burns, Dan Michael Burns, and Mark John Krapf, Defendants.

No. CR–88–035–GF.

United States District Court,
D. Montana,
Great Falls Division.

May 16, 1989.

Byron Dunbar, U.S. Atty., D. Mont., Billings, Mont., Robert J. Brooks, Asst. U.S. Atty., Butte, Mont., for plaintiff.

Michael W. Cotter, Great Falls, Mont., for Creed Miles Evans.

Mark Higgins, Gary Zadick, Ugrin, Alexander, Zadick & Slovak, Great Falls, Mont., for defendants.

## MEMORANDUM AND ORDER

HATFIELD, District Judge.

On April 28, 1988, the United States of America filed a 37–count indictment against defendants Creed Miles Evans, John William Burns, Dan Michael Burns, and Mark John Krapf, alleging, *inter alia,* violations of the National Firearms Act, 26 U.S.C. § 5801, *et seq.,* and the Gun Control Act of 1982, 18 U.S.C. § 921, *et seq.* Defendants Creed Miles Evans and John William Burns [1] have filed four separate motions requesting the court dismiss the indictment herein.[2]

1. Creed Miles Evans and John William Burns are the sole remaining defendants herein, given the fact Mark John Krapf and Dan Michael Burns have already entered into plea agreements.

2. Specifically, defendants' motions are premised on the following: (1) failure to allege a violation of the laws of the United States; (2) unconstitutionality of the charging statutes; (3) violation of due process; and (4) grand jury misconduct.

3. 26 U.S.C. § 5845(b) provides "[t]he term 'machine gun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are

## BACKGROUND

Count One of the indictment charges Creed Miles Evans and John William Burns with conspiring to cause the illegal possession of firearms, namely, machine guns, as that term is defined by 26 U.S.C. § 5845(b),[3] in violation of 18 U.S.C. § 371 (conspiracy to illegally receive, possess, transfer and import firearms), 922(*o* )[4] and 26 U.S.C. § 5861(d) (unlawful receipt or possession of a machine gun). Counts Two through Ten charge John William Burns, doing business as DMB Enterprises, with aiding and abetting the unlawful possession of machine guns by various individuals.[5] Finally, Count Twenty–Seven charges John William Burns with conspiring to illegally possess a machine gun.

With respect to the conspiracy charge in Count One, the Government asserts Burns organized DMB Enterprises for the purpose of purchasing Sten MKII submachine gun component parts from Evans and advertising and selling said parts as kits. The Government further alleges Burns knew that Evans, through a business known as BSI, was producing, advertising and selling blank receiver tubes for Sten MKII submachine guns along with detailed step by step instructions, including drawings and a receiver template, to be followed in the assembly of functioning Sten MKII submachine guns from the tube and compo-

in the possession or under the control of a person."

4. 18 U.S.C. § 922(*o* ) provides:
 (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machine gun.
 (2) This subsection does not apply with respect to—

 . . . . .

 (B) any lawful transfer or lawful possession of a machine gun that was lawfully possessed before the date this subsection takes effect [*i.e.,* May 19, 1986].

5. Similarly, Counts Twenty–Three through Twenty–Eight charge Creed Miles Evans, doing business as BSI and Intergun, with aiding and abetting the unlawful possession of machine guns. Counts Eleven through Twenty–Two charge Burns, d/b/a DMB Enterprises and Evans, d/b/a BSI, with aiding and abetting the unlawful possession of machine guns.

nent parts kits. The Government maintains Burns referred his customers to BSI for blank receiver tubes and machine gun assembly instructions, while, on the other hand, Evans allegedly referred his customers to DMB Enterprises for Sten MKII submachine gun parts kits.[6] Accordingly, the crux of the conspiracy charged in Count One is that Evans and Burns illegally conspired to sell and deliver to any paying customer all the parts necessary to assemble machine guns, which could not legally be possessed or assembled by private persons after May 19, 1986, the effective date of 18 U.S.C. § 922(o).

DISCUSSION

1. *Failure to State an Offense*

█ Burns and Evans contend the indictment, in its entirety, fails to state an offense against either of them. They assert the allegations of the respective counts contained in the indictment simply fail to set forth that these defendants illegally possessed or conspired to cause the illegal possession of a "machine gun," as that term is defined in 26 U.S.C. § 5845(b). Specifically, Burns and Evans contend the allegations that they dealt in unregulated Sten parts (excluding frames or receivers),[7] and in unregulated pieces of metal pipe, are insufficient, as a matter of law, to satisfy the statutory definition of a "combination of parts from which a machine gun can be assembled."[8] The absence of any specific allegations that a "frame" or "receiver" was involved, the defendants submit, renders the indictment insufficient as a matter of law. Burns and Evans protest that the Government is impermissibly attempting to expand the statutory definition of "machine gun" to include any combination of

raw material from which a machine gun can be fabricated or manufactured, as opposed to simply "assembled" from complete component parts.

In response, the Government maintains a plain reading of section 5845(b) reveals an intent on the part of Congress to regulate the possession of machine guns in all of their various forms and permutations. The Government asserts that an acceptance of the defendants' argument would serve to unravel the fabric of the statute that Congress drafted to comprehensibly regulate machine guns. Upon review, the court is compelled to agree.

Prior to 1968, the statutory definition of "machine gun," *i.e.*, 26 U.S.C. § 5845(b), referred only to fully assembled machine guns. In 1968, however, the definition was amended by the Gun Control Act of 1968 to include "any combination of parts from which a machine gun can be assembled." Finally, in 1986, the definition of "machine gun" was expanded to include "any part designed and intended solely and exclusively ... for use in coverting a weapon into a machine gun...." The stated purpose for the 1986 amendment was "to help control the sale of incomplete machine gun conversion kits that now circumvent the prohibition on selling completed kits." *United States v. Goff*, 677 F.Supp. 1526, 1545 (D.Utah 1987), *citing*, H.Rep. No. 945, 99th Cong., 2d Sess. 28, *reprinted in* 1986 U.S. CODE CONG. & ADMIN.NEWS pp. 1326, 1354.

In *United States v. Goff, supra*, 677 F.Supp. 1526, the court addressed an issue similar to that raised by the defendants

---

6. The Government alleges the defendants maintained a putative separation between their respective companies as a subterfuge because the Bureau of Alcohol, Tobacco and Firearms ("BATF") had notified Evans that a Sten MKII component parts kit (which includes sten submachine gun component parts, steel tube to be fabricated into a submachine gun receiver, and detailed assembly instructions) constituted a "combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person" and was, therefore, a "machine gun", as that term is defined by Title 26, U.S.C. § 5845.(b).

7. The frame or receiver of a machine gun is the stock of the weapon to which the firing mechanism and barrel must be separately added in order to make the gun operable.

8. 26 U.S.C. § 5845(b) defines "machine gun" as: "... any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person."

herein.[9] Specifically, the defendants in *Goff* moved to suppress certain evidence seized by agents of the Bureau of Alcohol, Tobacco and Firearms, namely, 833 aluminum blocks alleged to be ARDCO AM 180, M–2 machine gun receivers and 356 aluminum receiver blocks alleged to be receivers in various stages of production. Defendants asserted the search warrants under which the BATF agents were operating only permitted seizure of those receivers which would qualify as "firearms."

In rejecting defendants' contentions, the court stated the BATF agents were authorized to seize, in any stage of their production, receivers that allegedly had been ordered by the defendants for production after May 19, 1986, the effective date of section 922(*o*). *Goff, supra,* 677 F.Supp. at 1545. The court went on to state that while the defendants might question whether an aluminum block is a "part" as contemplated in 26 U.S.C. § 5845(b), "the clear congressional intent permeating the statute is that the prohibition on the possession of machine guns, including receivers, extends to materials intended for use in their production. Here, there is no question that the aluminum blocks seized were intended for use in the assembly or fabrication of receivers." *Id.* at 1546.

In the case *sub judice,* it is beyond dispute that the steel tubes at issue were destined, despite defendants' assertions to the contrary, to be fitted as machine gun receivers. Accordingly, in conformance with the *Goff* decision, this court is constrained to conclude said tubes fall within the statutory definition of "machine gun" and, therefore, defendants' contention that the indictment fails to allege an offense against them is without merit.

In the alternative, Burns and Evans take the position that even if they supplied others with unregulated machine gun parts or tubes from which a receiver could be fabricated, the indictment fails to allege they intended, knew or agreed that anyone would possess or use such parts and tubes

unlawfully. Suppliers of legal commodities, including firearm parts, are entitled, defendants submit, to the presumption that purchasers will use the commodities lawfully. Accordingly, they assert the indictment fails to allege they conspired or aided and abetted an illegal act, *i.e.,* illegal possession of a machine gun. Upon review, the court is constrained to reject defendants' argument.

There exists a paucity of case law addressing the precise issue *sub judice.* However, the court is guided by the reasoning employed by several courts in addressing the analogous issue in the context of drug conspiracies. *See, e.g., U.S. v. Orozco–Prada,* 732 F.2d 1076, 1080 (2nd Cir.1984), *cert. denied,* 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984); *U.S. v. Barnes,* 604 F.2d 121, 154–55 (2nd Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980) ("Importers, wholesalers, purchasers of cutting materials, and persons who 'wash' money are all as necessary to the success of the venture as is the retailer. They can all be held to have agreed with one another in what has been called a 'chain' conspiracy.")

In *United States v. Perry,* 643 F.2d 38, 44 (2nd Cir.1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981), the court held defendants who "agreed to distribute diluents with the intent that they be mixed with heroin and distributed by one or more heroin networks" could be convicted "under 21 U.S.C. § 846 of conspiring to violate 21 U.S.C. § 841 by aiding and abetting the distribution of heroin." The Court further stated that "the knowing supply of a raw material necessary for the commission of a crime by another constitutes aiding and abetting that crime." Finally, in *United States v. Washington,* 858 F.2d 590 (10th Cir.1988), the court upheld a conviction for conspiracy to manufacture phencyclidine ("PCP") as against certain defendants whose only acts in furtherance of the alleged conspiracy were to

9. The defendants in *Goff* were indicted on twelve counts under, *inter alia,* 26 U.S.C. §§ 5861(d) and 5871 (possession of unregistered firearms), 18 U.S.C. § 2 (aiding and abetting), and 26 U.S.C. § 5861(f) (unlawful manufacture of firearms).

enter into a conspiracy to obtain piperidine.[10]

■ The above-referenced decisions stand for the proposition that an agreement to engage in actions that are integral to the success of a drug venture prohibited by 21 U.S.C. § 841—such as laundering proceeds, or supplying cash or raw materials—violates 21 U.S.C. § 846 as a conspiracy to aid and abet the distribution of controlled substances. *Orozco–Prada, supra,* 732 F.2d at 1080. Analogizing those decisions to the facts in the present action, the court is compelled to reject defendants' argument that suppliers of legal commodities, including firearm parts, are entitled to the presumption that purchasers will use them lawfully. Defendants knew the Sten submachine gun parts kits and blank receiver tubes were key components to assemble a machine gun. That knowledge, coupled with the surrounding circumstances, is sufficient, in this court's opinion, to state an offense to aid and abet the possession of a machine gun. Accordingly, the court concludes defendants' motion to dismiss for failure to state an offense be, and the same hereby is, DENIED.

### 2. *Unconstitutionality*

■ Burns and Evans next contend that 18 U.S.C. § 922(*o*) was not enacted pursuant to any enumerated power of Congress and, therefore, is constitutionally void. Contrary to the defendants' assertion, however, the legislative history of the Gun Control Act of 1968 evinces that Congress placed the restrictions upon the possession and transfer of new machine guns because it found that the proliferation of machine guns in the channels of interstate commerce posed a threat to the lives and safety of law enforcement officers and to the public. Accordingly, the enactment of 18 U.S.C. § 922(*o*) by Congress was a valid exercise of the authority vested in that entity by the Commerce Clause. The de-

fendants present no cogent argument to the contrary.

The claim of unconstitutionality advanced by the defendants is predicated upon the conclusion that because section 922(*o*) fails to require a nexus with interstate commerce, as an essential element of the offense proscribed, the validity of the statute cannot be premised upon the exercise of the authority vested in Congress by the Commerce Clause. Absent a requirement that the prohibited conduct bear a nexus to interstate commerce, so the argument goes, enforcement of the statute would represent a dramatic, and impermissible, intrusion by the federal government into an area traditionally reserved to the several states. Moreover, because Congress failed to manifest a clear intent to regulate intrastate activity when it enacted section 922(*o*), the defendants submit the federal courts are precluded from inferring such an intent. Accordingly, the defendants contend the statute must be declared void upon the ground it exceeds the constitutional powers granted Congress by the Commerce Clause.

As would be expected, the defendants rely upon the Supreme Court's decision in *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). However, the Court in *Bass* expressly declined to reach the question upon which the defendants' position in the case at bar is based, *i.e.,* whether, upon appropriate findings, Congress can constitutionally punish the "mere possession" of firearms without requiring that a nexus with interstate commerce be proven as an essential element of the proscribed conduct. *United States v. Bass,* 404 U.S. at 339, n. 4, 92 S.Ct. at 518, n. 4. The Court in *Bass* proceeded to hold that a nexus with interstate commerce is an essential element of a violation of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. App. § 1202(a). *Bass,* however, is inapposite to the issue presented for resolution. In-

---

**10.** Piperidine, which is not a controlled substance, is a colorless liquid which has various industrial uses, but is also a "precursor" for making PCP. In *Washington,* the appellant argued the prosecution lacked any legally sufficient evidence to show he conspired with anyone to manufacture PCP because the evidence showed he simply conspired to possess piperidine, which in and of itself is not a criminal offense.

stead, the court finds the rationale expressed by the United States Supreme Court in *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), to be controlling.

In *Perez* the Court upheld Title II of the Consumer Credit Protection Act, 18 U.S.C. §§ 891 *et seq.*, which makes a federal crime of extortionate credit transactions, otherwise commonly referred to as "loan sharking". The defendant Perez had been convicted of "loan sharking" activities in New York. All of Perez' activities were purely intrastate in character, having taken place totally within the State of New York. The question presented was whether the Consumer Protection Act, as construed and applied to Perez, was a permissible exercise by Congress of its powers under the Commerce Clause. 402 U.S. at 146–147, 91 S.Ct. at 1357–1358. At issue was the authority of Congress to establish a federal crime for wholly intrastate activity, since the act did not require any specific connection between the "loan sharking" activity and interstate commerce.

Justice Douglas, speaking for the Court, traced the Court's restoration of the broad view of the authority vested in Congress by the Commerce Clause; a view initially espoused by Chief Justice Marshall in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). In emphasizing the plenary nature of the authority vested in Congress by the Commerce Clause, Justice Douglas implicitly reiterated the Court's view that the Commerce Clause represents a complete grant of power unrestricted by the tenth amendment. 402 U.S. at 157–58,

91 S.Ct. at 1363, Stewart, J., dissenting.[11] The Court stressed the limited role of the federal courts in passing on the validity of legislation wherein Congress itself has said that a particular activity affects commerce. Quoting from *United States v. Darby, supra*, the Court emphasized that in passing on the validity of legislation wherein Congress has determined that a particular activity affects commerce, the only function of courts is to determine whether the particular activity regulated or prohibited is within the reach of the federal power. 402 U.S. at 152, 91 S.Ct. at 1360.

■ 18 U.S.C. § 922(*o*) regulates a class of activities without requiring proof that the particular intrastate activity proscribed had a demonstrable effect upon interstate commerce. In determining the constitutional validity of 18 U.S.C. § 922(*o*) the federal courts may not second-guess the wisdom of the legislative decision to regulate a class of activity which is purely intrastate in character, but the court's only function is to determine whether the activity prohibited is within the reach of the federal power. *Perez v. United States, supra*, 402 U.S. at 152, 91 S.Ct. at 1360.

■ The plenary nature of the commerce power was clearly articulated by Chief Justice Stone in *Wrightwood Dairy:*

> The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to

11. As noted by Justice Douglas in *Perez*, with its decisions in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) and *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Court had returned to the broad view of the Commerce Clause. 402 U.S. at 151, 91 S.Ct. at 1360. In *Darby* the Court specifically recognized that the tenth amendment did not serve as a basis for restricting the power of Congress under the Commerce Clause:

> Our conclusion is unaffected by the tenth amendment ... the amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had

been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers.

312 U.S. at 123–24, 61 S.Ct. at 461–62.

Subsequently in *Wickard*, the Court recognized it was appropriate for the judiciary to defer to the judgment of Congress concerning economic effects and the relationships between local activities and interstate commerce and refrain from restricting the power of Congress by independently reviewing the "directness" of connections to commerce. 317 U.S. at 120–25, 63 S.Ct. at 86–89.

make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce.... The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitutio n....it follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.

*U.S. v. Wrightwood Dairy Co., supra,* 315 U.S., 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942). The only checks on the commerce power are the specific constitutional guarantees and rights. Consequently, exercise of the commerce power to regulate intrastate activities "is not limited to those who are engaged also in interstate commerce. The injury, and hence the power, does not depend upon the fortuitous circumstance ·that the particular person conducting the intrastate activities is, or is not, also engaged in interstate commerce.... It is the effect upon interstate commerce or upon the exercise of the power to regulate it, not the source of the injury which is the criterion of congressional power." 315 U.S. at 121, 62 S.Ct. at 527 (citations omitted).

It is beyond dispute the commerce power vests Congress with the authority to regulate the interstate transportation of products, including firearms. In the exercise of its legislative judgment, Congress has, in fact, deemed it appropriate to regulate the movement of certain firearms in interstate commerce. The plenary nature of the commerce power vests Congress with the authority to determine the means by which to effectuate that regulation. The means by which Congress chooses to regulate the interstate movement of firearms "... is within the sound and exclusive discretion of the Congress. It is subject only to one caveat—that the means chosen by it must be reasonably adapted to the end permitted by the Constitution.... The Constitution requires no more." *Heart of Atlanta Motel, Inc. v. U.S.,* 379 U.S. 241, 261–62, 85 S.Ct. 348, 359–60, 13 L.Ed.2d 258 (1964). The defendants present no cogent argument which persuades the court it was irrational for Congress to conclude that even mere possession of a "machine gun" is an appropriate means to the attainment of a legitimate end, *i.e.,* the effective regulation of the movement of machine guns in interstate commerce. *See, Perez v. U.S., supra,* 402 U.S. at 154, 91 S.Ct. at 1361.[12]

### 3. *Due Process*

Evans and Burns also move to dismiss the indictment, in its entirety, upon the ground that prosecution upon the charges set forth constitutes a violation of the rights secured the defendants by the Due Process Clause of the fifth amendment to the United States Constitution. The court perceives the defendants' argument to be two-pronged in nature. First, the defendants contend the Government, acting through the Bureau of Alcohol, Tobacco and Firearms, has violated defendants' right to due process of law by sanctioning the conduct of the defendants upon which the charges contained in the indictment are premised. Second, the defendants submit the prosecution is based upon a "ruling" of the Bureau of Alcohol, Tobacco and Firearms, which was not validly adopted. The court addresses the merits of the defendants' arguments accordingly.

 The defendants' assertion that the indictment is appropriately dismissed because the Government sanctioned the con-

---

**12.** The argument presented by the defendants implicitly suggests that it is essential for Congress to state an express finding that activity proscribed by legislation enacted under the commerce power affects interstate commerce. The majority opinion by Justice Douglas in *Perez* clearly dispels this suggestion. The Court in

*Perez* obviously gave deference to the congressional findings regarding the effect prescribed conduct had upon interstate commerce. 402 U.S. at 155–156, 91 S.Ct. at 1362. The Court expressly noted, however, that Congress need not make particularized findings in order to legislate. 402 U.S. at 156, 91 S.Ct. at 1362.

duct upon which the charges contained in the indictment are predicated constitutes an assertion of the due process defense of entrapment by estoppel. As the defendants correctly note, entrapment by estoppel applies when a defendant, in reliance upon statements by a government official, is misled into believing that his conduct would not be contrary to federal law. *See, U.S. v. Tallmadge,* 829 F.2d 767, 773–75 (9th Cir.1987) *(citing, U.S. v. Hsieh Hui Mei Chen,* 754 F.2d 817 (9th Cir.1985), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985)). In defense to the charges filed against them, the defendants in the case at bar are free to assert that they possessed the firearms in issue in reliance upon the respresentation of government officials that the possession of those firearms was not proscribed by federal law. *Tallmadge,* 829 F.2d at 774. The defendants could not be prosecuted under 18 U.S.C. § 922(*o* ) if a government official had represented to them that the possession of the firearms in dispute did not constitute a violation of section 922(*o* ). *Id.* The court does not, however, agree with the defendants that dismissal of the indictment upon the ground of estoppel is appropriate under the circumstances of the present case. The Government vehemently disputes that respresentations, sufficient to support the defense of entrapment by estoppel, were made by government officials to these defendants. Based upon the record as presently developed, the court is constrained to conclude that the issue of whether the government, in its dealings with these defendants, acted in such a manner as to create the reasonable belief on the part of the defendants that their possession of the firearms in issue did not constitute criminal conduct is a question properly resolved by the trier of fact upon appropriate instruction by the court.[13]

The second prong of the defendants' due process challenge is predicated upon the erroneous belief that the Government, through the Bureau of Alcohol, Tobacco

and Firearms, was required to issue a formal interpretive ruling setting forth what items would constitute "any combination of parts from which a machine gun can be assembled" within the meaning of 26 U.S.C. § 5845(b). The absence of such a formal ruling by the Government, the defendants submit, serves to render their prosecution under the indictment filed against them violative of the defendants' right to due process of law.

The Administrative Procedure Act recognizes that an administrative agency may engage in four types of rule making: substantive, interpretive, general statements of policy, and procedural. 5 U.S.C. § 553. *See also, Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Of concern in the matter *sub judice,* is the interpretive rule making of an administrative agency. Interpretive rules issued by an administrative agency are designed to advise the public of the agency's construction of a particular statute by announcing the position of the agency with respect to the meaning of the statute. *See, U.S. v. 353 Cases etcetera Mountain Valley Mineral Water,* 247 F.2d 473 (8th Cir.1957); *American Medical Association v. Heckler,* 606 F.Supp. 1422 (S.D.Ind. 1985); *see also, Montana Power Co. v. Environmental Protection Agency,* 429 F.Supp. 683 (D.Mont.1977). Interpretive rules do not have the force and effect of law and, accordingly, do not have a substantial impact on any party. *See, National Nutritional Foods Association v. Weinberger,* 512 F.2d 688 (2d Cir.1975); *Herron v. Heckler,* 576 F.Supp. 218 (N.D.Cal.1983). Because interpretive rules do not have the force and effect of law, they are not binding on a court and a court, obviously, may disagree with the rule. *See, Seneca Oil Co. v. Department of Energy,* 712 F.2d 1384 (Emer.Ct.App.1983); *Energy Consumers & Producers Association v. Department of Energy,* 632 F.2d 129 (Emer. Ct.App.1980); *Aiken v. Obledo,* 442

---

**13.** To establish entrapment by estoppel, the defendants bear the burden of proving that they were misled by statements of a government agent into the belief that their conduct was lawful. *See Hsieh Hui Mei Chen,* 754 F.2d at 821–25. *See also, U.S. v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986).

F.Supp. 628 (E.D.Cal.1977); *see also, Ruangswang v. Immigration and Naturalization Service,* 591 F.2d 39 (9th Cir. 1978). Because interpretive rulings do not have future effect within the meaning of 5 U.S.C. § 551(4) and are not binding on courts, issuance of such rules are not, except where expressly required by statute, subject to the notice and comment rule making procedures prescribed by 5 U.S.C. § 553. 5 U.S.C. § 553(b)(A).

The defendants suggest an agency is required to issue an interpretive rule where issuance of such a rule would clarify the meaning of an existing statute. The defendants offer no authority in support of their proposition that the failure of an agency, charged with enforcement of a particular criminal statute, to issue an interpretive ruling clarifying or explaining the meaning of that statute may constitute a violation of the right to due process of law of an individual charged under that statute. The court is unpersuaded that the failure of an administrative agency to issue an interpretive ruling constitutes a viable defense to a charge under a criminal statute validly enacted by Congress. The situation is simply not akin to the promulgation of a substantive rule of law by an administrative agency in accordance with the delegation of power by Congress. The Bureau of Alcohol, Tobacco and Firearms was not un- der any obligation to issue an interpretive ruling with respect to that agency's interpretation of the definition of "machine gun" set forth in 26 U.S.C. § 5845(b). Consequently, the court is compelled to reject the defendants' proposition to the effect that the failure of the Government, acting through the Bureau of Alcohol, Tobacco and Firearms, to issue an interpretive ruling regarding the meaning of 26 U.S.C. § 5845(b) constitutes a violation of the defendants' right to due process of law.[14]

### 4. *Grand Jury Misconduct*

Mr. Julius Wachtel, the investigating agent of the Bureau of Alcohol, Tobacco and Firearms, represented to the grand jury which handed down the indictment in this matter, that an informal letter ruling by the Administrator of the Bureau of Alcohol, Tobacco and Firearms was a "formal" ruling by that agency regarding those items, the possession of which, constitutes "parts from which a machine gun can be assembled" as that term is defined in 26 U.S.C. § 5845(b). The Government admits that Wachtel did, in fact, represent to the grand jury that the letter in issue was a formal ruling by the Bureau of Alcohol, Tobacco and Firearms, issued in accordance with the administrative regulations promulgated by the Bureau regarding issuance of formal rulings.[15]

---

**14.** The defendants' argument is premised upon the erroneous conclusion that the conduct of the investigating agent in representing the effect of an informal ruling by the administrator of the Bureau of Alcohol, Tobacco and Firearms *(see, infra )*, was tantamount to a formal rule making by the Bureau. From this erroneous premise, the defendants proceed to posit that the Bureau violated its own rule making procedures as established in 27 C.F.R. § 71.41(d). While the misrepresentation apparently made by the agent may arguably have served to contaminate the grand jury proceedings leading to the indictment filed against the defendants, as discussed herein, the actions of the agent do not provide a basis for a finding that the conduct of the agency in failing to issue a formal interpretive ruling constitutes a deprivation of these defendants' right to due process of law.

**15.** Title 27 Code of Federal Regulations, section 71.41(d) provides, in pertinent part:

All Bureau of Alcohol, Tobacco, and Firearms regulations and amendments thereto are pub- lished as Treasury decisions which appear in the Federal Register, the Code of Federal Regulations, and the monthly Alcohol, Tobacco and Firearms (ATF) Bulletin. The ATF Bulletin is the authoritative instrument of the Bureau for announcing Treasury decision, legislation, administrative matter, and other items of general interest.... It is the policy of the Bureau to publish in the Bulletin all substantive rulings necessary to promote a uniform application of all laws administered by the Bureau as well as rulings that supersede, revoke, modify, or amend any of those previously published in the Bulletin....

Subsection (d)(2)(i) and (ii) of § 71.41, in turn, provide in part:

An 'ATF Ruling' is an official interpretation by the Bureau that has been published in the Bulletin for the information and guidance of taxpayers, Bureau officials and others concerned. ATF Rulings represent the conclusions of the Bureau of the law to the entire state of facts involved.

The defendants submit the indictment is appropriately dismissed as the product of deliberate or reckless misconduct in grand jury proceedings. *See, U.S. v. Basurto,* 497 F.2d 781 (9th Cir.1974); *U.S. v. Thompson,* 576 F.2d 784 (9th Cir.1978). Specifically, the defendants contend the misrepresentation made by Wachtel, in contravention of the prescriptions of 27 C.F.R. § 71.41(d), constituted perjury and served to prejudice the grand jury against the defendants in violation of the Due Process Clause of the fifth amendment. The defendants also allude to the fact that dismissal of the indictment would be appropriate in the exercise of the court's supervisory power.

Assuming, for purposes of analysis, that the misrepresentation of Wachtel constituted perjury, in the true sense of the word, the dispositive issue is whether presentation of the misrepresentation to the Grand Jury is the sort of flagrant misconduct which justifies dismissal of an indictment under the Due Process Clause or the supervisory powers of the court. The standards the trial court must consider in deciding the propriety of dismissing an indictment, based on perjured testimony having been presented to the grand jury, are succinctly discussed in *United States v. Claiborne,* 765 F.2d 784 (9th Cir.1985). Noting the sharp limitations established in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), regarding a defendant's ability to challenge the nature of the evidence presented to a grand jury, the court in *Claiborne* recognized the defendant bears the burden of overcoming the presumption of regularity which attaches to grand jury proceedings. 765 F.2d at 791, *citing, United States v. Woods,* 544 F.2d 242, 250 (6th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977); *Beverly v. United States,* 468 F.2d 732, 743 (5th Cir. 1972). A defendant may overcome this presumption of regularity by demonstrating that the prosecutor obtained an indictment by knowingly submitting perjured testimony to the Grand Jury. 765 F.2d at 791 (*citing, United States v. Thompson, supra,* 576 F.2d at 786; *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)). However, before an indictment is dismissed upon the ground that perjured testimony was presented to the grand jury, whether the dismissal is predicated upon due process grounds or in the exercise of the court's supervisory powers, the trial court must be satisfied that the perjured testimony was material. 765 F.2d at 791 (citations omitted). Accordingly, if there exists sufficient non-perjurous testimony to support the indictment, the indictment should not be dismissed on the assumption that the grand jury would have returned an indictment had the perjurous evidence not been presented. 765 F.2d at 791–92 (citations omitted).

The continued vitality of the standards discussed in *Claiborne* was recently noted in *United States v. Benny,* 786 F.2d 1410, (9th Cir.1986) wherein the court reaffirmed the rule governing dismissal of an indictment based on perjured testimony before a grand jury, which it first announced in *United States v. Kennedy, supra,* 564 F.2d at 1338:

> [O]nly in a flagrant case, and perhaps only where knowing perjury, relating to material matter, has been presented to the grand jury should the trial judge dismiss an otherwise valid indictment returned by an apparently unbiased grand jury. To hold otherwise would allow a mini trial as to each presented indictment contrary to the teaching by Mr. Justice Black in *Costello v. United States,* 350 U.S. 359[, 76 S.Ct. 406, 100 L.Ed. 397] (1956)....

It is the policy of the Bureau to publish in the Bulletin all rulings and other communications to members of the public or to Bureau field offices involving substantive law, procedures affecting taxpayers' rights or duties, or industry regulations....

Finally, subsection (d)(2)(iii) expressly provides that "no unpublished ruling or decision may be relied on, used, or cited by any officer or employee of the Bureau as a precedent in the disposition of other cases."

In the case at bar, the court is unpersuaded by the defendants' assertion that the misrepresentation made by Wachtel to the grand jury prejudiced the proceedings to such a degree as to compel the conclusion that the grand jury would not have returned an indictment but for the representation having been made. The defendants' conclusion is based upon pure speculation, insufficient to justify this court's intervention into the grand jury proceedings. *See, United States v. Claiborne, supra,* 765 F.2d at 792. The misrepresentation did not pertain to a historical fact bearing upon the issue of whether the defendants knowingly possessed the physical items as alleged, or knowingly conspired to cause the illegal possession of those same items. The misrepresentation regarding the stature of the informal letter ruling in issue, does not carry with it, any impermissible connotation which would have bore upon the determination of probable cause made by the grand jury. The term "formal" as used in the context of Wachtel's testimony is significant in a purely legal sense, and its use in the context of testimony to the grand jury would be of no practical consequence. Consequently, the misrepresentation was not material in nature. More importantly, the defendants do not contend that there existed a lack of non-perjurous testimony to support the indictment. Under the circumstances, the Court is unable to conclude that the misrepresentation made by Wachtel rises to the level of flagrant misconduct which requires dismissal of an indictment under the Due Process Clause or supervisory powers of the court.

Therefore, for the reasons set forth herein,

IT IS HEREBY ORDERED that the motions to dismiss of the defendants, Creed Miles Evans and John William Burns, be, and the same hereby are, DENIED.

IT IS FURTHER ORDERED that the above-entitled action is scheduled for trial before the court, with a jury, on Tuesday, the 6th day of June, 1989, at the hour of 9:30 o'clock A.M., in the courtroom of the above-entitled court. Each of the parties shall file his charge to the jury, in NARRATIVE FORM, with an extra copy for the court's used, on or before May 30, 1989. Counsel shall keep in mind that the charge should encompass all rules of law applicable to the evidence adduced. Appropriate citations should be noted by use of footnote.