**F.J. VOLLMER COMPANY, INC., Appellant,**

v.

**Stephen E. HIGGINS, Director, Bureau of Alcohol, Tobacco and Firearms, Appellee.**

**No. 92–5365.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 1994.

Decided May 17, 1994.

Stephen P. Halbrook, argued the cause and filed the briefs for appellant.

Fred E. Haynes, Asst. U.S. Atty., argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty.,

John D. Bates and R. Craig Lawrence, Asst. U.S. Attys.

Before: EDWARDS, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

It is a federal criminal offense "to transfer or possess a machinegun," unless the person lawfully possessed the machinegun before May 19, 1986, or the weapon is transferred "to or by, or possess[ed] by or under the authority of, the United States or any department or agency thereof...." 18 U.S.C. § 922(*o*). The Secretary of the Treasury, through the Bureau of Alcohol, Tobacco and Firearms, is authorized to approve or deny transfers. 26 U.S.C. § 5812(a); 27 C.F.R. pt. 179. The Bureau must deny an application for a transfer if it "would place the transferee in violation of the law." 26 U.S.C. § 5812(a).

F.J. Vollmer Company, Inc., a licensed manufacturer of firearms, filed two transfer applications with the Bureau. The first related to a weapon consisting of a machinegun conversion kit, manufactured and registered before May 19, 1986, and a semiautomatic receiver Vollmer had reconfigured after that date. The second related to a weapon also containing a machinegun conversion kit, but having a receiver Vollmer had restored to its original condition after reconfiguring it. Upon receipt of a letter from the Bureau in effect denying Vollmer's applications, the company sued for judicial review. The district court granted summary judgment in favor of the Bureau and this appeal followed.[1]

## I

■ Vollmer's first application related to a machinegun identical to 174 others in its possession—a Heckler and Koch Model 94 (HK 94) semiautomatic rifle with a modified receiver and installed machinegun conversion kit. Machinegun conversion kits are, according to the Bureau, "used to convert semiautomatic weapons into automatic weapons without the use of a machinegun receiver." Brief for Appellee at 2. Such a conversion kit is itself a "machinegun" under 18 U.S.C. § 921(a)(23), which incorporates the National Firearms Act's definition of the term in 26 U.S.C. § 5845(b):

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

According to previous Bureau rulings, machinegun conversion kits manufactured and registered before May 19, 1986, may be installed on rifles after that date without running afoul of § 922(*o*)'s prohibition.[2] Vollmer could not take advantage of the grandfather clause in § 922(*o*)(2)(B), however, because in the Bureau's view Vollmer manufactured machineguns after the cutoff date by modifying the receivers. A receiver is "that part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward position to receive the barrel." 27 C.F.R. § 179.11. Vollmer removed from each rifle receiver an attachment block and drilled a hole in the magazine housing. As the Bureau saw it, these modifications—although not necessary to install the machine-

---

1. Vollmer also sought a writ of mandamus, which the district court denied. Vollmer has presented no argument against this aspect of the court's judgment, and it is therefore affirmed. *See Rollins Environmental Servs., Inc. v. EPA,* 937 F.2d 649, 652 n. 2 (D.C.Cir.1991); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) (Scalia, J.).

2. This is because a conversion kit is considered a machinegun under the statute. So long as the kit was lawfully possessed prior to the cutoff date, combining the kit with other, non-machinegun parts after that date does not alter its lawful status.

gun conversion kit—removed the only two physical differences between the HK 94 semiautomatic rifle receiver and a machinegun receiver made by the same company (an HK MP5).[3]

The Bureau's reasoning is sound. Vollmer legally possessed the machinegun conversion kits and it therefore could legally transfer them even if it attached them to rifles made after May 19, 1986. But modified receivers falling within § 921(a)(23)'s definition of a "machinegun," as these did, may not be transferred. It is difficult to understand how combining a legal conversion kit with a time-barred receiver could transform the illegal receiver into a legal one. Vollmer's argument is that each of its 174 weapons is simply one machinegun. Modifying the receiver, in other words, still left Vollmer with one operational machinegun, whereas the Bureau's position leads to the conclusion that Vollmer possessed two machineguns, one consisting of the conversion kit and the other consisting of the receiver, both of which had to be taxed and registered separately.

But the Bureau did not determine that one machinegun is two for taxing or registration purposes. It merely said that anything meeting the statute's definition of machinegun and made after the cutoff date cannot be transferred or possessed even if combined with an otherwise lawfully possessed machinegun. In defining machineguns to include receivers, Congress did not distinguish between receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation. Vollmer conceded that if the company's modified receivers stood alone, it could not transfer them. See United States v. Evans, 712 F.Supp. 1435, 1438–39 (D.Mont.1989), aff'd, 928 F.2d 858 (9th Cir. 1991); United States v. Goff, 677 F.Supp. 1526, 1543–46 (D.Utah 1987). There is nothing in the statute to suggest that installing the illegally possessed receivers into otherwise lawfully possessed machineguns would make a difference.

■ In an argument based on an estoppel theory, Vollmer claims to have relied upon a letter from the Bureau advising the company that it could legally reconfigure the receivers. The argument goes nowhere. The letter did not directly mention receiver modifications. Even if we interpreted the Bureau's general statements to comprehend that subject, the letter by no means represents the sort of affirmative misconduct required to estop the government from enforcing its laws. See Heckler v. Community Health Servs. of Crawford County, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984); INS v. Miranda, 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982) (per curiam); INS v. Hibi, 414 U.S. 5, 8, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (per curiam).

■ Vollmer's final point regarding its 174 machineguns is that the Bureau is acting inconsistently since it has allowed others to possess machineguns having receivers modified after the cutoff date. The Bureau's position is rather more refined than Vollmer represents. After Congress passed legislation banning machineguns, but before the legislation became effective, manufacturers seeking to register machineguns prior to the cutoff date flooded the Bureau with applications. The Bureau wound up registering almost 16,000 conversion kits. As the Bureau discovered later, many of these conversion kits would not function unless the receivers were modified by various milling operations, operations which constituted the manufacture of a machinegun. The Bureau therefore did not regard these so-called conversion kits as eligible for registration as machineguns prior to May 19, 1986. Several manufacturers, after installing the non-qualifying conversion kits on rifles with modified receivers, transferred the assembled machineguns to unsuspecting individuals. Between May 19, 1986, and January 1988, the Bureau approved many such transfers. In late 1987, when the Bureau became aware of the problem, it began inspecting firearms manufacturers to determine whether certain conversion kits were registrable items. On January 14, 1988, the Bureau implemented a policy to deal with the situation. It allowed innocent buyers of the problem machineguns to remain eligible for continued conditional registration; and it granted conditional exceptions to individuals

3. Vollmer said it made the changes for cosmetic reasons.

or dealers who in good faith had installed conversion kits on receivers modified after the cutoff date. The Bureau made clear, however, that it would not approve transfers requested by manufacturers who had performed the receiver modifications. Vollmer is such a manufacturer, and it does not fall under the good faith or innocent owner exceptions.

For the reasons given, the district court correctly granted the Bureau's motion for summary judgment in regard to the 174 machineguns with receivers Vollmer had modified after May 19, 1986.

## II

■ Vollmer's second transfer application related to a machinegun in which the modified HK 94 receiver had been remodified and returned to its original state. Presumably, Vollmer accomplished this by filling the hole in the magazine and refitting the attachment block, so that the receiver once again duplicated an HK 94 semiautomatic receiver. The Bureau refused to approve a transfer because "[i]t is not possible for a receiver which was modified to permit automatic fire to be modified back into a semiautomatic firearm and removed from the purview of the National Firearms Act." According to the Bureau, only destroying the receiver can remove it from § 922(o)'s proscription.

The administrative record does not contain the reasoning behind the Bureau's interpretation. Counsel for the agency tells us that it rests on the National Firearms Act. The Act regulates "firearms," which are a specific category of weapons defined in 26 U.S.C. § 5845(a). A machinegun is a firearm. *Id.* Under the Act, anything that can be "readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" is a machine-

gun. 26 U.S.C. § 5845(b). Bureau counsel asserts that the receiver at issue is "potentially restorable," but the Bureau made no findings of fact and offered no reasoned explanation on the subject.[4] This alone would warrant setting aside the agency's action and remanding the case. 5 U.S.C. § 706(2)(A); *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990); *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498–99 (D.C.Cir.1988); *Environmental Defense Fund v. EPA,* 852 F.2d 1316, 1326 (D.C.Cir. 1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). We believe it appropriate, however, to consider the other questions raised by the Bureau's decision. Vollmer is entitled to a decision on these questions now. Violation of 18 U.S.C. § 922(o) is a criminal offense, punishable by fine and imprisonment. 18 U.S.C. § 924(a)(2). Failing to pay taxes on and failing to register a machinegun are violations of the National Firearms Act, punishable by fine and imprisonment. 26 U.S.C. § 5871.

It is true that the National Firearms Act covers machineguns, as well as short-barrelled rifles and shotguns, even if they have been modified, so long as they can be "readily restored." 26 U.S.C. § 5845(b), (c), & (d).[5] Neither the Act nor the Bureau's regulations, however, define "readily restored." *See* 26 U.S.C. § 5845; 27 C.F.R. § 179.11. We do know that, in the Bureau's view, "firearms" subject to the Act may be excluded from coverage if they are "[a]lter[ed] by removing the feature or features that cause[d] the weapon to be classified as an NFA firearm." FIREARMS ENFORCEMENT PROGRAM, ATF Order 3310.4B ¶ 83(e)(2), at 43 (Feb. 8, 1989). Alterations of this sort include welding an extension onto a rifle or shotgun barrel; and welding closed a slot on certain handguns to

---

4. On at least two previous occasions, during a prosecution, the Bureau has presented evidence that the machinegun could be restored in two minutes, *United States v. Woodlan,* 527 F.2d 608, 609 (6th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976), or in an eight-hour working day in a properly equipped machine shop. *United States v. Smith,* 477 F.2d 399, 400–01 (8th Cir.1973).

5. As originally enacted in 1934, the National Firearms Act defined machinegun as "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot without manual reloading, by a single function of the trigger." 26 U.S.C. § 2733(b) (1940). The Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213, altered the definition to include the phrase "readily restored to shoot."

prevent the attachment of a shoulder stock. *Id.* ¶ 83(f)(2) & (4), at 43. The Bureau must believe that if welding removes a critical feature, the firearm cannot be "readily restored" and it therefore can be removed from the firearm classification. In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole. Vollmer's welding the attachment block back onto the magazine and filling the hole it had drilled do not appear to be significantly different from the operations the Bureau describes as sufficient to remove a short-barrelled rifle or shotgun from the category of "firearm." It would seem to follow that Vollmer's operations thus removed the HK receiver from the category of machinegun.

The Bureau's contrary conclusion raises a related problem. From all that appears, it is just as easy to turn a brand new HK 94 semiautomatic rifle receiver into a machinegun receiver as it is to do the same to a formerly-modified-but-later-restored receiver such as the one Vollmer now possesses. Yet it is incredible to suppose that every HK 94 semiautomatic rifle receiver made since May 19, 1986, must therefore be considered readily restorable and illegal under 18 U.S.C. § 922(o).[6]

The district court upheld the Bureau's action on a rationale not yet discussed: "Since the statute authorizes ATF to regulate machine guns that are inoperable and unlikely to become operable, the statute clearly authorizes the Agency to regulate machineguns that remain operable."[7] This is unpersuasive. Vollmer's machinegun remains subject to regulation, just as an inoperable firearm remains subject to regulation. Vollmer thus must obtain the Bureau's permission before transferring the weapon. The question is not whether the machinegun assembled from the conversion kit and the receiver will be regulated, but whether the restored HK receiver is itself a machinegun and is thus illegal to possess. Even if we were less certain that the restored receiver is not itself a machinegun, we must resolve the ambiguity in Vollmer's favor, as the Supreme Court instructed in *United States v. Thompson/Center Arms Co.,* —— U.S. ——, —— n. 9, 112 S.Ct. 2102, 2110 & n. 9, 119 L.Ed.2d 308 (1992). Accordingly, the Bureau erred in treating Vollmer's restored receiver as a post cutoff date (and thus illegal) machinegun.

*Affirmed in part and reversed in part.*

---

6. One might contend that a new, unaltered receiver never achieved the status of machinegun and therefore cannot be "restored." The Bureau, however, believes that the phrase "readily restored" applies even to weapons that have never been assembled. *See United States v. Drasen,* 845 F.2d 731, 735–37 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

7. Machineguns and other firearms that become "unserviceable"—that is, incapable of firing and incapable of being readily restored to a firing condition, 26 U.S.C. § 5845(h)—"may be transferred as a curio or ornament," 26 U.S.C. § 5852(e).